DURANT v STATE OF MICHIGAN

SCHMIDT v STATE OF MICHIGAN

Docket Nos. 104458-104492. Argued April 10, 1997 (Calendar No. 13). Decided July 31, 1997.

Donald Durant, on behalf of seven taxpayer residents of the Fitzgerald School District and the Fitzgerald School District, brought an action for mandamus in the Court of Appeals under Const 1963, art 9, § 32, the Headlee Amendment, against the Department of Education, the Department of Management and Budget, and the State Treasurer, alleging that the state was violating its duty under art 9, § 29 to maintain the state-financed proportion of the necessary costs of activities that state law required the plaintiff school district to perform. The Court, DANHOF, C.J., and CAVANAGH and D. R. FREEMAN, JJ., denied mandamus in an opinion per curiam, ruling that the plaintiffs must first exhaust their administrative remedies under the Headlee implementation act, 1979 PA 101, MCL 21.231 et seq.; MSA 5.3194(601) et seq. (Docket No. 51431). 110 Mich App 351 (1981). The Supreme Court, in lieu of granting leave to appeal, reversed and remanded for further proceedings. 413 Mich 862 (1982).

On remand, the Court of Appeals, DANHOF, C.J., and CAVANAGH and MACKENZIE, JJ., determined that elementary and secondary education as a whole was not a state-mandated activity under art 9, § 29, and that the proper focus was on more specific programs. The Court dismissed the case without prejudice to the plaintiffs' right to pursue alternate remedies on the ground that there were disputed facts (Docket No. 63901). 129 Mich App 517 (1983). The Supreme Court affirmed with respect to education as a whole, reversed the procedural dismissal, noting that § 32 gave the taxpayers the right to proceed in the Court of Appeals, remanded the case, and suggested the appointment of a Special Master to act as a factfinder. 424 Mich 364 (1985).

Macomb Circuit Judge George R. Deneweth subsequently was appointed Special Master. With permission, the plaintiffs filed a first amended complaint, alleging that the state had failed to maintain its share of the school district's necessary costs in performing a wide range of specified, state-mandated activities. On second

remand, the Court of Appeals, DANHOF, C.J., and GILLIS and MACKENZIE, JJ., adopted the Master's recommendations that special education, special education transportation, driver's education, and the school lunch and supplemental milk programs were state-mandated activities within § 29, but disagreed with some of the recommendations regarding how to compute necessary costs, and remanded the case for recalculation of the amounts involved (Docket No. 91271). 186 Mich App 83 (1990). The defendants appeal.

Gerald Schmidt, fifty other taxpayers, and fifty-one school districts brought an action in the Court of Appeals under Const 1963, art 9, § 32, against the Department of Education, the Department of Management and Budget, and the State Treasurer, modeling their complaint for relief on the first amended complaint in *Durant*. The plaintiffs sought a money judgment for each school district on the basis of the state's failure to maintain funding at each district's base-year level. The Court of Appeals, DANHOF, C.J., and GILLIS and MACKENZIE, JJ., dismissed the case in an unpublished order, stating that a claim for underfunding under the first sentence of art 9, § 29 must be based on a decrease in the funding for an activity across all school districts in the state, i.e., as long as the state aid for a program given to all school districts across the state did not fall below the proportion of necessary costs supported in the base year statewide, it did not matter if some school districts saw individual levels of support fall (Docket No. 132677). The Supreme Court reversed and remanded, holding that each unit of local government should have a right to continued state support for state-mandated activities, but that use of different base-year proportions for each unit of government would build in undesirable anomalies. It held further that the base-year proportion would be computed statewide and that each local unit could rely on that proportion in each ensuing year. 441 Mich 236 (1992). Because, as a result of *Schmidt*, all the computations in *Durant* were rendered inaccurate, the Supreme Court remanded *Durant* to the Court of Appeals for further consideration in light of *Schmidt*. 441 Mich 930 (1993).

The Court of Appeals consolidated *Durant* and *Schmidt* and added a third group of thirty-three actions (Docket Nos. 93547-93577, 93658, 125691) raising similar issues that had been filed in the Court of Appeals and held in abeyance pending the Supreme Court's decision in *Schmidt*. In an opinion per curiam, the Court of Appeals, DOCTOROFF, C.J., and MACKENZIE and CORRIGAN, JJ., appointed Wayne Circuit Judge James E. Mies as Special Master to succeed Judge Deneweth (Docket No. 161321). 203 Mich App 507 (1994). Thereafter, in an opinion per curiam, the Court adopted the

recommendations of the Special Master with regard to post-*Schmidt* issues not relevant to this appeal (Docket No. 161321). 213 Mich App 500 (1995). The defendants appeal.

In an opinion per curiam, signed by Chief Justice MALLETT, and Justices CAVANAGH, BOYLE, and KELLY, the Supreme Court *held*:

Special education and special education transportation are state-mandated activities or services within the meaning of Const 1963, art 9, § 29. The "state match" payment for the federal national school lunch program is part of the state-financed proportion of necessary costs for the purpose of computing compliance with art 9, § 29. Payments that are required of the state by art 9, § 29 are funds constitutionally dedicated for specific purposes and are exempt from executive order reduction under art 5, § 20. The plaintiffs' attorney fees in this case are part of the costs that may be recovered under art 9, § 32. In addition to declaratory judgment, a money judgment for the plaintiff school districts is appropriate for the full amount of underfunding for 1991-92, 1992-93, and 1993-94, with the boards of education to determine the appropriate distribution of the money for tax refunds, tax relief, or other public purposes.

1. Special education is required by state law. Nothing in art 9, § 29 relieves a local unit of government of its state-mandated duty to provide an activity such as special education where federal law creates a similar obligation. The language of § 29 and other provisions of the Headlee Amendment suggest that the voters did not intend an exception for federal mandates.

2. The school lunch program is mandated by state law within the meaning of art 9, § 29. Under the federal National School Lunch Act, 42 USC 1756, in which some Michigan school districts voluntarily participate, federal grants to a state are conditioned on the state supporting the program with a match payment equal to at least thirty percent of a prior year's federal grant to the state. The act does not require that all local school districts in a state participate in the program in order for the state and participating districts to receive federal aid. The state match payment is part of the state-financed proportion of necessary costs. Section 29 requires that the state maintain its proportionate financing for the necessary costs of a state-mandated activity. If these criteria are met, it does not matter that a portion of the base-year aid was designed to maximize the benefits of a local districts' voluntary choice to receive federal aid.

3. Art 9, § 29 moneys are "funds constitutionally dedicated for specific purposes" within the meaning of art 5, § 20. The funding required by art 9, § 29 is dedicated for the purpose of fulfilling the

state's obligation to support state-mandated activities and services. The argument that the state's ability to deal with impending deficits will be impeded by the decision in this case and that it will be forced to impose educational cuts most heavily on the districts that are least able to afford it, because those are the districts that receive unrestricted aid not protected by art 9, § 29, is outdated in light of the substantial reform in school financing made by adoption of Proposal A, amending art 9, §§ 3, 5, 8, and 11. Further, the state would be free to reduce or eliminate state mandates and, thus, reduce its obligations under art 9, § 29.

4. In future cases, the correct remedy will typically be limited to a declaratory judgment. However, the defendants' prolonged recalcitrance in these cases necessitates a substantial recovery aimed at providing taxpayer relief and assisting the districts to recover from the effects of underfunding. The people's directive in § 32 "to enforce" § 29 was intended as a general directive, giving the Court the duty and authority to enforce § 29 in the way which would most effectuate the balances struck by the people in the Headlee Amendment. To deny taxpayers relief would be to deny the reality that they have suffered real dollar losses throughout this protracted litigation. It would also ignore that, where the Headlee Amendment anticipated specific compliance problems, it provides specific relief for the taxpayers, and might also provide incentive for protracted litigation in the future. It would ignore the many effects of underfunding on general education students. The defendants did not interject the special education issue on which most of the damages turned until eight years into the litigation, contradicting their prior statements. When the Court of Appeals resolved the issue against the defendants, the defendants declined to honor the Court of Appeals decision for almost seven years. However, affirming the full judgment of the Court of Appeals would be inconsistent with the balances struck by the Headlee Amendment and by Proposal A. The aim is to give plaintiffs meaningful redress (to "enforce" § 29) without undermining the current security enjoyed by the state taxpayers.

5. Money damages, without interest, are to be paid to the plaintiff school districts for the full amount of underfunding of each district during 1991-92, 1992-93, and 1993-94. The board of education of each plaintiff school district is to determine the appropriate distribution between taxpayer relief and projects for the benefit of the district. The checks and balances of the democratic process will assure that each board of education effectively assesses the harm to be addressed and the method of addressing it.

Affirmed in part.

Justice BRICKLEY, joined by Justices RILEY and WEAVER, concurring in part and dissenting in part, agreed with the reasoning of the majority opinion in parts I, II, III, and IV, but dissented with respect to part V regarding the remedy it contends is authorized under art 9, § 32. Article 9, § 32 should be applied as written and the state should be ordered to meet its financial obligations under art 9, § 29, by paying its proportionate share of the costs for special education and for the school lunch program. The Supreme Court does not have authority to order monetary damages for a violation of § 29 of the Headlee Amendment because § 32, the enforcement provision, only gives the courts authority to order declaratory relief.

The fact that the people included a revenue refund for a violation of § 26, but not for § 29, indicates that the people did not envision monetary relief for a violation of § 29. There is no grant of authority to bring an action for monetary damages against the state of Michigan without an express statement by the people or the Legislature.

Through the majority's vague understanding of "enforce," it has created a license to fashion any remedy that it deems fit. The ordinary person would understand § 32 to confer authority only on the courts to provide declaratory relief for a violation of § 29. The people ratifying these amendments likely believed that it would be easy to identify when the state either enacted a new program, but failed to provide for the funding, or reduced funding for an existing state-mandated service, and that the courts would then expeditiously order the end of the violation. Hence, there would be no reason to provide for monetary damages. The Supreme Court has not been empowered to create this novel solution. The result is not consistent with the basic point of the Headlee Amendment, which is to provide relief for taxpayers. The practical effect of this relief is to give the taxpayers in these school districts relief at the expense of the taxpayers of the rest of the state.

Whether the Court awards damages to the school districts, local taxpayers, or both, state taxpayers will ultimately foot the bill. Although the state has demonstrated prolonged recalcitrance in resolving this matter, it hardly justifies foisting what may be the largest damage award in state history on the very parties—taxpayers—that the Headlee Amendment was intended to protect. A damage award against the state is a damage award against the state taxpayer, and taxpayers cannot be compensated by paying money to themselves. State taxpayers benefitted from the state's ability to shift special education expenses to the local level, and, as the local tax burden rose, the corresponding state tax burden fell. Thus, the net effect of declining state special education funding on taxpayers

was neutral. Accordingly, the majority's reliance on the "real dollar losses" of local taxpayers is misplaced.

The school districts' claim of damages is unconvincing because the school districts exist in a representative capacity, acting on behalf of local taxpayers and students. Because a school district stands in relation to the state as does a subsidiary to its parent corporation, it does not have an inherent right to damages. Its claim to damages can only be as worthy as those of the students and the taxpayers it represents. For divergent reasons, neither of these groups warrants financial relief. Although taxpayers may have had their millages increased at a local level, all Michigan taxpayers benefitted from lower state taxes made possible, in part, by the state's declining responsibility for special education costs. Consequently, taxpayers did not necessarily suffer real dollar losses. The sure, simple, and most direct way in which to give the taxpayers relief is to award the school districts a declaratory judgment. The majority's remedy will punish the Michigan taxpayers, whom the Headlee Amendment was intended to protect, by requiring an increase in state taxes, cuts in state programs, or both.

Justice WEAVER, concurring in part and dissenting in part, concurred with the reasoning and result of the majority opinion in parts I, II, III, and IV, but would hold with Justice BRICKLEY that a declaratory judgment is appropriate in these consolidated cases. Declaratory judgment is the best way to insure that the taxpayers are not forced to carry the burden, for a second time, of the underfunded mandates. Further, if the majority wishes to insure taxpayer relief, it should mandate that the school districts directly return all the money damages to the taxpayers rather than rely on the expectation that the democratic process will inform and shape distribution of the award. The majority's instructions leave the door open for a school district not to refund even a penny to the taxpayer and to create for itself a windfall from the money damages. The average taxpayer on the street will have neither the knowledge, the time, nor the energy to seek the refund to which the majority says he is entitled. The democratic process has already made clear that the taxpayer is tired of being burdened by state and local governments.

213 Mich App 500; 541 NW2d 278 (1995) affirmed in part.

*Pollard & Albertson, P.C.* (by *Dennis R. Pollard* and *Richard E. Kroopnick*), for the plaintiffs.

*Frank J. Kelley,* Attorney General, *Thomas L. Casey,* Solicitor General, *Paul J. Zimmer, Edith C.*

*Harsh, Jane A. Wilensky,* and *Jeffrey J. Butler,*
Assistant Attorneys General, for the defendants.

Amici Curiae:

*Alfred H. Hall,* Senate Majority Counsel, *Philip K.
Douma,* House Minority Counsel, and *Lisa K. Gig-
liotti, Michael G. O'Brien, Michael R. Severino,* and
*Mark J. Newman,* Assistants Senate Majority Coun-
sel, for Dick Posthumus, Ken Sikkema, Harry Gast,
Donald Gilmer, Dan DeGrow, and Glenn Oxender.

*White, Przybylowicz, Schneider & Baird, P.C.* (by
*Karen Bush Schneider* and *Thomas A. Baird*), and
*Hoekenga & Farrell, P.C.* (by *Daniel J. Hoekenga*),
for Michigan Education Association.

*Thrun, Maatsch & Nordberg, P.C.* (by *Gordon W.
Van Wieren, Jr., Lisa L. Swem,* and *Cheryl Takacs
Bell*), for Michigan School Districts.

PER CURIAM. Today we consider and resolve five
questions relating to the Maintenance-of-Support
Clause of Const 1963, art 9, § 29,[1] part of the "Headlee
Amendment":

---

[1]    *The state is hereby prohibited from reducing the state financed
proportion of the necessary costs of any existing activity or ser-
vice required of units of Local Government by state law.* A new
activity or service or an increase in the level of any activity or ser-
vice beyond that required by existing law shall not be required by
the legislature or any state agency of units of Local Government,
unless a state appropriation is made and disbursed to pay the unit
of Local Government for any necessary increased costs. The provi-
sion of this section shall not apply to costs incurred pursuant to
Article VI, Section 18. [Emphasis supplied.]

(1) Are special education and special education transportation state-mandated activities or services within the meaning of art 9, § 29? Yes.

(2) Is the "state match" payment for school lunches part of the "state financed proportion" for the purpose of computing compliance with art 9, § 29? Yes.

(3) Are payments that are required of the state by art 9, § 29 "funds constitutionally dedicated for specific purposes" and exempt from executive order reduction under Const 1963, art 5, § 20? Yes.

(4) Are plaintiffs' attorney fees in this case part of the costs that may be recovered under Const 1963, art 9, § 32? Yes.

(5) What is the appropriate remedy for the violation of art 9, § 29 in this case? A money judgment for plaintiff school districts for the full amount of underfunding for 1991-92, 1992-93, and 1993-94, to use for refunds for taxpayers, tax relief, or other public purposes.

### THE HEADLEE AMENDMENT

Sections 25 through 34 of article 9 of the Constitution of 1963 were adopted pursuant to initiative petition, Proposal E, at the general election of November 7, 1978.[2] They are popularly called the "Headlee Amendment." The Headlee Amendment imposes on state and local government a fairly complex system of revenue and tax limits. These are summarized in art 9, § 25 and implemented in the following sections.

---

[2] Proposal E also amended art 9, § 6. That change is not relevant to the issues raised in this case.

There are three main elements. Section 26 limits any changes in total state revenues to an amount based on changes in personal income in the state. Section 31 prohibits units of local government from levying any new tax or increasing any existing tax above authorized rates without the approval of the unit's electorate.[3]

The third element of the Headlee system is summarized in art 9, § 25, which states in part, "The state is prohibited from requiring any new or expanded activities by local governments without full state financing, from reducing the proportion of state spending in the form of aid to local governments, or from shifting the tax burden to local government."[4] These requirements are implemented in §§ 29[5] and 30.[6] The application of the general, even vague, concepts of these sections to the complexities of state-local relations has proven a difficult task, as illustrated by the history of this case.

---

[3] Compare these limits with the fifteen-mill limit of art 9, § 6, the first limit on the taxing power of the state, originally added to the 1908 Constitution in 1932. See *Pontiac School Dist v Pontiac*, 262 Mich 338, 344-345; 247 NW 474 (1933).

[4] This Court has explained:

> Having placed a limit on state spending, it was necessary to keep the state from creating loopholes either by shifting more programs to units of local government without the funds to carry them out, or by reducing the state's proportion of spending for "required" programs in effect at the time the Headlee Amendment was ratified. [*Livingston Co v Dep't of Management & Budget*, 430 Mich 635, 644; 425 NW2d 65 (1988).]

[5] See n 1.

[6] The proportion of total state spending paid to all units of Local Government, taken as a group, shall not be reduced below that proportion in effect in fiscal year 1978-79.

HISTORY OF PROCEEDINGS

This case is a consolidation of three groups of original actions filed in the Court of Appeals under art 9, § 32.[7] The first of these, the *Durant* case, was filed on May 7, 1980, on behalf of seven taxpayers who were residents of the Fitzgerald School District and that district. Defendants are the Department of Education, the Department of Management and Budget, and the State Treasurer. Plaintiffs alleged that the state was violating its duty under art 9, § 29 to maintain the state-financed proportion of the necessary costs of activities that state law orders plaintiff school district to perform.

The Court of Appeals is an appellate court that has not been set up to conduct trials, much less trials involving complex factual questions. It initially ruled that the plaintiffs must first exhaust administrative remedies under the act passed by the Legislature to implement the Headlee Amendment, 1979 PA 101, MCL 21.231 *et seq.*; MSA 5.3194(601) *et seq.*;[8] 110 Mich App 351; 313 NW2d 571 (1981). This Court reversed, ruling that plaintiffs were not required to exhaust administrative remedies before the local government claims review board. 413 Mich 862 (1982).

---

[7]   Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

[8] The Headlee implementation act was passed under art 9, § 34, "The Legislature shall implement the provisions of Sections 25 through 33, inclusive, of this Article." Although the Legislature passed the act, it failed to follow through and provide the necessary funding. The act provided for an administrative remedy for local units of government, but not taxpayers. MCL 21.240; MSA 5.3194(610).

On remand from this Court, the Court of Appeals ruled on a number of significant points in the continuing progress of the case. The most basic substantive question at that time was whether elementary and secondary education as a whole was a state-mandated activity[9] within the requirements of § 29. The Court of Appeals determined that it was not and that the proper focus was on more specific programs, listing special education as an example of such an activity. 129 Mich App 517, 526; 342 NW2d 591 (1983).[10] The Court also ruled that it was unable to grant relief, particularly mandamus because there were disputed facts and again dismissed the case. *Id.* at 534. This Court affirmed the substantive holding of the Court of Appeals concerning education as a whole. 424 Mich 364; 381 NW2d 662 (1985). However, we reversed the Court of Appeals procedural dismissal, noting that § 32 gave the taxpayers the right to proceed in the Court of Appeals. We remanded the case to the Court of Appeals, suggesting the appointment of a Special Master to act as factfinder. 424 Mich 394.

The Court of Appeals accepted the suggestion and appointed Macomb Circuit Judge George R. Deneweth as Special Master. The case was submitted on live testimony, depositions, extensive stipulations of facts, and lengthy briefs. Among the many issues

---

[9] There is no distinction in this case between "activity" and "service" under § 29. For convenience, we will refer only to "activity," without commenting on whether there is any specific distinction between the two terms or, if so, whether the programs discussed in this decision would be activities or services in light of any distinction.

[10] In other substantive matters, the Court ruled that the state proportion of the necessary costs should be based on state "categorical" aid dedicated for use in each specific program and that the state would not receive any credit for "unrestricted" aid. The Court also defined the term "necessary costs."

raised by the parties and addressed in the Special Master's report are the four issues raised by defendant in this appeal. On each of these issues, the Special Master and Court of Appeals have consistently ruled in favor of plaintiffs. The Court of Appeals accepted the Master's holdings that special education, special education transportation, driver's education, and school lunch and supplemental milk programs were state-mandated activities within § 29. All these were the beneficiaries of specific categorical state aid. The Court rejected a claim by plaintiffs on the basis of activities mandated by statute that had not been supported by specific "categorical" aid. It disagreed with some of the Master's recommendations on how to compute "necessary costs." It remanded for recalculation of the amounts involved. 186 Mich App 83; 463 NW2d 461 (1990). Defendants filed an application for leave to appeal with this Court.

In the meantime, a second group of plaintiffs, consisting of fifty-one taxpayers and fifty-one school districts, filed their own original action in the Court of Appeals, *Schmidt v State of Michigan* (Docket No. 132677). Their complaint for relief was modeled on the first amended complaint in *Durant*. In the context of the multiple school districts, a question appeared that had been hidden in *Durant*, which had only one school district plaintiff. In *Schmidt*, the proportional support that the state had provided in base year 1978-79 varied from district to district, even for the same activity. The assumption of the complaint was that these built-in variances would be maintained. The complaint asked for a money judgment for each school district on the basis of the state's failure to maintain funding at each district's base-year level.

The Court of Appeals dismissed the *Schmidt* claim in an unpublished order, entered November 9, 1990 (Docket No. 132677).[11] The order stated that a claim for underfunding under the first sentence of art 9, § 29 must be based on a decrease in the funding for an activity "across all school districts in the state." That is, as long as the state aid for a program given to all school districts across the state did not fall below the proportion of necessary costs supported in the base year (statewide), it did not matter if some school districts saw their individual levels of support fall.[12]

On appeal, this Court reversed. Unlike art 9, §§ 26 and 31, which specify corrections for anticipated problems, § 29 does not address remedy, or even the problem noted by the Court of Appeals, whether an individual unit of government has an enforceable right to have its own level of support maintained.[13] In an effort to devise a solution most likely to effectuate the will of the electorate that adopted § 29, we decided that each unit of local government should have a right to continued state support for state-mandated activities, but that use of different base-year proportions for each unit of government would build in undesirable anomalies. Thus, we held that the base-year proportion would be computed on a state-wide level and each local unit could count on that base level of support in each ensuing year. 441 Mich

---

[11] The Court denied rehearing on January 14, 1991.

[12] The order of the Court of Appeals, and the decision of this Court also addressed an issue relating to financing the employer's share of social security taxes, discussed below.

[13] Each visit of these combined cases to this Court has involved a basic question regarding the proper remedy not addressed in art 9, § 29, but one necessary to resolve before giving judicial relief.

236; 490 NW2d 584 (1992). We remanded *Schmidt* to the Court of Appeals.

The result of *Schmidt* was that all the computations in *Durant* were inaccurate. We remanded *Durant* to the Court of Appeals in light of *Schmidt.* 441 Mich 930 (1993).

On remand, the Court of Appeals consolidated *Durant* and *Schmidt* and added a third group of thirty-three cases raising similar issues that had been filed at the Court of Appeals and held in abeyance pending our decision in *Schmidt.* The Court of Appeals, 203 Mich App 507; 513 NW2d 195 (1994), appointed Wayne Circuit Judge James E. Mies as Special Master.[14] Judge Mies decided a number of post-*Schmidt* issues not relevant to this appeal. The Court of Appeals accepted his recommendations, 213 Mich App 500; 541 NW2d 278 (1995). After initially denying leave to appeal, 453 Mich 892 (1996) (BOYLE, J., dissenting), we granted reconsideration and leave to appeal, 453 Mich 952 (1996) (CAVANAGH, J., dissenting).

ANALYSIS

I. SPECIAL EDUCATION AND SPECIAL EDUCATION
TRANSPORTATION

Article 9, § 29 indicates, in part:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law.

---

[14] Judge Deneweth, who served so well as the original Special Master, had passed away.

Defendants concede that special education[15] is required by state law.[16] However, they argue that when an activity is required or imposed by federal law, it is not required by state law within the meaning of Const 1963, art 9, § 29, citing *Schmidt, supra,* 441 Mich 262 and, by analogy, *Sacramento v California,* 50 Cal 3d 51; 266 Cal Rptr 139; 785 P2d 522 (1990). They further argue that the federal requirement is found in three sources: the Education for All Handicapped Children Act (EAHCA) (now called the Individuals with Disabilities Education Act—IDEA), which provides financial assistance for states that have complying special education programs, 20 USC 1401 *et seq.*; § 504 of the Rehabilitation Act of 1973, 29 USC 794, which prohibits discrimination against the handicapped in programs receiving federal aid; and the Equal Protection Clause of the Fourteenth Amendment of the Constitution of the United States. Because we reject defendants' argument that there is an exception in § 29 for federal mandates, we do not address the argument that federal law mandates special education.

---

[15] The arguments and analysis do not differentiate between special education and special education transportation. Unless indicated otherwise, we will use "special education" to refer to both.

[16] Specifically, special education was originally mandated by 1971 PA 198 for school year 1973-74 and thereafter. The act is currently codified in article 3 of the Revised School Code, MCL 380.1701 *et seq.*; MSA 15.41701 *et seq.*

MCL 380.1751(1); MSA 15.41751(1) now provides, in pertinent part:

> The board of a local school district shall provide special education programs and services designed to develop the maximum potential of each handicapped person in its district on record under section 1711 for whom an appropriate educational or training program can be provided in accordance with the intermediate school district special education plan . . . .

Plaintiffs argue that defendants are misreading *Schmidt.* There is no exception in art 9, § 29 for state mandates that are also subject to a federal mandate, and that such an exception would be contrary to the intent of the electorate in adopting the Headlee Amendment.

The Court of Appeals, on second remand, 186 Mich App 105, rejected defendants' arguments "because state law imposes a stricter obligation on the state and its local units of government and because these governmental entities are charged with the duty of establishing and implementing specific programs and related services . . . ."

We first consider and reject defendants' arguments that we recognized a federal exception in *Schmidt.* We then consider whether we should now recognize such an exception.

Defendants do not base their argument for a federal-mandate exception on the language of art 9, § 29. Rather, they argue that this Court recognized such an exception in part III of our opinion in *Schmidt.* This part of *Schmidt* concerned the employer share of federal social security taxes. Before 1989, the state paid the employer share of federal social security taxes for school districts.[17] Beginning in 1989, the state decreased or eliminated that aid. Plaintiffs in *Schmidt* alleged that this violated art 9, § 29. We rejected that claim, stating:

> Plaintiffs sought to frame their social security costs claim as though social security coverage constituted a separate state-required activity or service. However, social security coverage is directly imposed by federal law and therefore

---

[17] The details are explained in *Schmidt,* 441 Mich 246-247.

not required by state law within the meaning of § 29. Second, social security coverage does not constitute an activity or service within the meaning of § 29. [441 Mich 262.]

Neither of these reasons helps defendants here. First, special education is "required . . . by state law" within the language of art 9, § 29.[18] Second, special education is an "activity or service" within that provision.[19]

The question remains whether there is such an exception. In deciding that question, we are guided by very basic rules of constitutional interpretation. In *Traverse City School Dist v Attorney General*, 384 Mich 390, 405; 185 NW2d 9 (1971), we stated that the primary rule of constitutional interpretation is the

---

[18] This is the focus of the first reason in the passage of *Schmidt*. See the dissent on this point by Chief Justice CAVANAGH, 441 Mich 281.

[19] Defendants also cite, by analogy, *Sacramento, supra*, applied to special education in *Hayes v Comm on State Mandates*, 11 Cal App 4th 1564; 15 Cal Rptr 2d 547 (1992). *Sacramento* construed Cal Const, art 13B, subsection 9(b) which held that the state had to reimburse local governments for new or increased state-required programs except for "[a]ppropriations required to comply with mandates of the courts or the federal government which, without discretion, require an expenditure for additional services or which unavoidably make the provision of existing services more costly." There is no such express exception in Const 1963, art 9, § 29. Thus, *Sacramento* does not provide support for defendants.

Indeed, the *Sacramento* court, referring to the interrelation between Cal Const, art 13B and art 13A, a tax-limit provision which was passed a year before art 13B and which contains no express exception for federally mandated programs, stated:

> Articles XIII A and XIII B work in tandem, together restricting California governments' power both to levy and to spend for public purposes. Moreover to the extent "federally mandated" costs are exempt from prior statutory limits on local taxation . . . , article XIII A eliminates the exemption insofar as it would allow levies in excess of the constitutional ceiling. [50 Cal 3d 59.]

Thus, the California Court was reluctant to read an exception for federal mandates into the California Constitution where the voters did not expressly approve such an exception. We agree with that approach.

rule of "common understanding" described in 1 Cooley, Constitutional Limitations (8th ed), p 143:

> "A constitution is made for the people and by the people. The interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it. 'For as the Constitution does not derive its force from the convention which framed, but from the people who ratified it, the intent to be arrived at is that of the people, and it is not to be supposed that they have looked for any dark or abstruse meaning in the words employed, but rather that they have accepted them in the sense most obvious to the common understanding, and ratified the instrument in the belief that that was the sense designed to be conveyed.' (Cooley's Const Lim 81.)"

### Chief Justice COOLEY also stated for this Court:

> [I]n seeking for its real meaning[,] we must take into consideration the times and circumstances under which the State Constitution was formed—the general spirit of the times and the prevailing sentiments among the people. Every constitution has a history of its own which is likely to be more or less peculiar; and unless interpreted in the light of this history, is liable to be made to express purposes which were never within the minds of the people in agreeing to it. This the court must keep in mind when called upon to interpret it; for their duty is to enforce the law which the people have made, and not some other law which the words of the constitution may possibly be made to express. [*People v Harding*, 53 Mich 481, 485; 19 NW 155 (1884).]

So, the question is whether the great mass of the people would have meant the following language to convey an exception for state mandates that are also federal mandates—or whether such an exception is a dark and abstruse meaning:

The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency or units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18. [Const 1963, art 9, § 29.]

There is certainly nothing in the language to suggest to the reader that there is an exception for federal mandates.

Nothing in § 29 relieves a local unit of government of its state-mandated duty to provide an activity, here special education, if federal law creates a similar obligation. The state statutes requiring special education, MCL 380.1701 *et seq.*; MSA 15.41701 *et seq.* do not refer to, and are not dependent on, the corresponding federal law. If the federal government rescinded the IDEA, Michigan school districts would still have an obligation to provide special education under state law. These services are required *independently* by state law.

There are, moreover, three suggestions in the language of § 29 and other provisions of the Headlee Amendment that the voters did not intend an exception for federal mandates: (1) § 29 itself contains one exception to its coverage, costs pursuant to art 6, § 18 (on judicial salaries); (2) the revenue and tax limit on state government in § 26 is subject to three listed exclusions, "federal aid," "principal and interest

on bonds," and "loans to school districts";[20] and (3) the definition of total state revenues in § 33 is "all general and special revenues, excluding federal aid . . . ." It seems very unlikely that the voters would have thought that § 29 implied such a huge exception as one for federal mandates when the section specified only one very trivial exception (judicial salaries). It is even more unlikely that the voters would have thought the role of the federal government too obvious to mention in § 29, when the amendment mentions that very topic in §§ 26 and 33.

While defendants urge a federal-mandate exception only for § 29, that argument has further implications that provide insight. The rationale for having a federal-mandate exception would be that the state had no free choice in passing the parallel state mandate.[21] However, there would be no reason not to apply that same rationale (1) on behalf of local governments who might seek to raise taxes without a vote of the people to pay for a federal or state mandate, contrary to the language of § 31, and (2) in favor of the state if it sought to exceed the tax and revenue limits of § 26 because of federal mandates. If there is one thing that is clear from the language of the Headlee Amendment and the historical context in which it was passed, it is that the voters intended to limit taxes. Thus, accepting defendants' argument here could eventually cause us to prune away the wide branches of the

---

[20] Section 26 establishes "a limit on the total amount of taxes which may be imposed by the legislature in any fiscal year . . . ." Basically, taxes must not be such that total state revenues grow faster than personal income in Michigan. Section 33 defines "total state revenues." Each section mentions and excludes federal aid from total state revenues.

[21] Recall that without a state mandate, § 29 does not come into play.

Headlee Amendment, until the taxpayers' sheltering oak was but a shrub.

Although of lesser import, we think the following three items suggest that a federal-mandate exception can only be found by a "dark or abstruse" reading of § 29.

First, in at least two other states where courts have considered whether special education is a state-mandated activity under constitutional limits that do not have an express federal limitation, the parties did not even think to argue for such an exception. One of these states, Missouri, has a tax-limitation provision modeled directly on our Headlee Amendment. See *Rolla 31 School Dist v Missouri*, 837 SW2d 1 (Mo, 1992), *Fort Zumwalt School Dist v Missouri*, 896 SW2d 918 (Mo, 1995), and *Worchester v Governor*, 416 Mass 751; 625 NE2d 1337 (1994).

Second, defendants did not start arguing in favor of a federal-mandate exception until the hearings before Special Master Deneweth, eight years after the commencement of these proceedings.[22] A meaning "most obvious to the common understanding" would have certainly made its appearance before that. Before that time, defendants had stated to this Court that special education was a state-mandated activity under § 29. Also before that time, the Legislature had begun funding all the "necessary costs" of local and intermediate school district compliance with revisions in the "administrative rules for special education," effective July 1, 1987. 1987 PA 220, subsection 51(3), MCL 388.1651(3); MSA 15.1919(951)(3).

---

[22] While we mention this delay, we are not finding waiver.

Third, the drafters' notes comment on whether there are exceptions to the Headlee requirements for federal mandates. Because the drafters' intent might have been different than the meaning given by the great mass of the people and the notes were published after passage of the amendment and were not available when the people voted, the notes are not authoritative. *Durant, supra,* 424 Mich 382, n 12. They are one tool available to the courts. *Schmidt, supra,* 441 Mich 257, n 24. In particular, the notes are one indication of a contemporaneous reading of the amendment. They state, with regard to § 29:

> It was the drafters' intent to include all necessary state mandated cost increases in this provision, including but not limited to: changes in general law which increase local governmental costs, e.g., increases in the state minimum wage law; changes in the civil and criminal statutes, e.g., mandatory sentencing; *federally encouraged changes in state law, e.g., unemployment compensation coverage;* collective bargaining or compulsory arbitration mandates, land use regulations, etc. [Emphasis added.]

With regard to § 26, the notes indicate:

> Directly or indirectly federally mandated spending increases are not exempted from the provisions of this section. It is the concensus [sic] that any problems arising from such federal requirements would be cured later on by a federal tax limitation amendment.

Both of these suggest the absence from § 29 of any exception for federal mandates.

II. STATE MATCH SCHOOL LUNCH PAYMENTS

State law has long authorized local school districts to provide free and full-cost meals to students. 1927

PA 319, part 2, ch 5, § 6; 1929 CL 7424, now MCL
380.1272; MSA 15.41272. Since 1946, the federal gov-
ernment has provided financial aid for the national
school lunch program, 42 USC 1751 *et seq.* Unlike the
IDEA, the various permutations of the National School
Lunch Act have not required that states, as a condi-
tion for receipt of federal funds, require that all local
school districts participate in the federal program. It
was not until 1977 PA 43, MCL 380.1272a through
380.1272d; MSA 15.41272(1) through 15.41272(4),[23]
that the Michigan Legislature mandated that all K-12
school districts in Michigan operate a school lunch
program[24] providing free and reduced price meals and
meeting the nutritional standards of 42 USC 1758
beginning October 1, 1978.[25] Under MCL 380.1272d;
MSA 15.41272(4), the state committed itself to pay
each school district up to five cents for each free
meal served and up to two cents for each reduced
price meal served. Defendants refer to this as the
"state supplemental payment."

---

[23] Subsection (1) of MCL 380.1272a; MSA 15.41272(1) states:

> The board of a K to 12 school district shall, and the board of
> another school district may, establish and operate a program under
> which lunch is made available to all full-time pupils enrolled and in
> regular daily attendance at each public school of the school
> district.

The programs must meet "[n]utritional standards prescribed by the United
States department of agriculture pursuant to section 9 of the national
school lunch act, 42 USC 1758 . . . ." MCL 380.1272b(a); MSA
15.41272(2)(a).

[24] The act also required that some K-12 school districts provide a hot
breakfast program. We are not concerned with any distinction between
lunch and breakfast.

[25] The state act contains an exception for years in which the federal or
state subsidy falls below a certain level. MCL 380.1272c; MSA 15.41272(3).

Defendants admit that the school lunch program is mandated by state law within the meaning of Const 1963, art 9, § 29, and they admit that they must continue the proportionate support of the state supplemental payments.[26] They contend, however, that the state's obligation to maintain funding under art 9, § 29 does not extend to what is called "the state match payment." This payment can be traced back to § 7 of the National School Lunch Act, 42 USC 1756, which conditions federal grants to a state on that state supporting the program with a match equal to at least thirty percent of the prior year's federal grant to that state.[27]

Defendants argue that the school districts voluntarily participate in the federal school lunch program, in the sense that they do not have to apply for and receive federal funds. They receive the state match payment only because they choose to accept federal funds. Defendants note that the amount of the state match payment is fixed and required by federal law and not subject to state control. Defendants argue that federal programs are not required by state law and are not activities or services within the meaning of Const 1963, art 9, § 29, citing *Schmidt, supra,* 441 Mich 262. They argue that, implicit in the requirement of art 9, § 29 that the state maintain the "state financed proportion" is the assumption that the state

---

[26] The parties stipulated that, using only the state supplemental payment, the state-financed proportion of the necessary costs of the school lunch program for base year 1978-79 was 1.6727 percent. Using all state aid, the proportion is 6.0127 percent.

[27] The state statute provides that the state supplemental payment shall be "credited to the state's matching share" under the federal program. MCL 380.1272d(d); MSA 15.41272(4)(d).

chose to make the payment to the local unit and had control over the amount and manner of distribution.

We reject defendants' arguments. We have already concluded that there is no exception in art 9, § 29 for federal mandates, as long as the activity or service is mandated by state law.[28] Even if there were such an exception, we would not find a federal mandate here, because the National School Lunch Act does not require that all local school districts in a state participate in the program in order for the state and participating districts to receive federal aid. Indeed, defendants do not contend that the National School Lunch Act constitutes a federal mandate.

Const 1963, art 9, § 29 provides, in pertinent part:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law . . . .

In applying the provision to the school lunch program, there are two questions. First, is school lunch an activity or service mandated by state law? Defendants admit it is. MCL 380.1272a; MSA 15.41272(1). Second, is the state match payment part of the state-financed proportion of necessary costs? It is obvious that it is. Defendants make no argument that plaintiff school districts have not used the state match pay-

---

[28] In the special education issue, defendants argued that art 9, § 29 provides an exception for programs mandated by federal law. Here, defendants broaden that to argue that art 9, § 29 provides an exception for federal programs in general. As long as the activity or service is mandated by state law, we see even less reason to create an exception to Headlee for all federal programs than for federal mandates.

ments to help meet the necessary costs of the school lunch program.

The defendants are really asking us to create an exception to art 9, § 29 for instances where the state did not "choose to make the payment to the local unit in the first instance and [does not have] the ability to control the amount and manner of distribution of the payment in subsequent years." This argument fails for two reasons.

First and most important, no such exception is apparent in art 9, § 29. The language focuses on one act of state decision making: the decision of the state to mandate an activity. In this case, the state chose to make the former option of local districts to provide a school lunch program into a mandate that, by coincidence, took effect only thirty-eight days before the election at which the people adopted the Headlee Amendment. The state could have, and still can, return to the local districts the option to participate.

Second, once the people adopted Headlee, the state lost direct control over the amount of all Headlee-required aid to local units of government. The state lost its freedom to reduce aid below the base-year proportion. This was the clear intent of art 9, §§ 29 and 30. Section 29 requires that the state maintain its proportionate financing for the necessary costs of a state-mandated activity. If these criteria are met, it does not matter that a portion of the base-year aid was designed to maximize the benefits of a local district's voluntary choice to receive federal aid. The "state match" payment was part of "the state financed proportion of the necessary costs" of the state-mandated lunch program in 1978-79.

Defendants argue that the state match payment has made well in excess of $100,000,000 a year in federal funds available to local school districts without any increase in costs to the local districts. Defendants argue that treating the state's cost in obtaining this benefit turns art 9, § 29 on its head and is irrational. We think that defendants are confusing the merits of the state match program with the requirements of art 9, § 29. Nothing in the constitutional provision addresses the merits of the state-mandated programs. The amendment leaves to the state the ability to adopt or continue those state mandates that the state deems meritorious, on condition that the state bear the necessary costs of new programs and maintain its support of continuing programs.

### III. EXECUTIVE ORDER REDUCTIONS

Defendants argue that state payments required by art 9, § 29 are subject to reduction under art 5, § 20, which provides:[29]

> No appropriation shall be a mandate to spend. The governor, with the approval of the appropriating committees of the house and senate, shall reduce expenditures authorized by appropriations whenever it appears that actual revenues for a fiscal period will fall below the revenue estimates on which appropriations for that period were based. Reductions in expenditures shall be made in accordance with procedures prescribed by law. *The governor may not reduce*

---

[29] It appears that this issue is moot, although neither party raises that point. The executive order reductions originally at issue occurred in school years 1981-82 and 1983-84. Funding for those years is no longer at issue in this case. See *Durant, supra*, 186 Mich App 99-100. We exercise our discretion to address the issue because it has been fully briefed and is capable of arising again in the future in situations in which delay in resolving the issue would adversely affect the Governor's compliance with the duty specified by art 5, § 20.

*expenditures of the legislative and judicial branches or
from funds constitutionally dedicated for specific pur-
poses.* [Emphasis supplied.]

Plaintiffs argue that art 9, § 29 moneys are "funds
constitutionally dedicated for specific purposes"
within the meaning of the language emphasized
above. Defendants argue that the passage refers to
funds specially earmarked by the constitution, such
as the one percent of the payroll of the classified ser-
vice that art 11, § 5 requires be appropriated for use
by the Civil Service Commission and the fuel taxes
that art 9, § 9 requires be used for various transporta-
tion purposes.

We agree with plaintiffs. Art 5, § 20 does not use
"funds" in a technical sense. The two constitutional
provisions cited by defendants as creating protected
funds do not use the word "fund." Art 9, § 9 refers to
certain tax revenues; art 11, § 5 requires appropria-
tion of a "sum." All that is required by art 5, § 20 is
that the funds be "constitutionally dedicated for spe-
cific purposes." The funding required by art 9, § 29 is
dedicated for the purpose of fulfilling the state's obli-
gation to support state-mandated activities and
services.[30]

Defendants imply that the state's ability to deal
with impending deficits will be impeded by this
aspect of today's decision and that it will force the
state to impose educational cuts most heavily on the

---

[30] Even if we were to interpret art 5, § 20 in the way that defendants
urge, we would only be creating a potential conflict between art 5, § 20,
which would allow reduced funding of state mandates, and art 9, § 29,
which specifies a minimum funding level. In such a case, art 9, § 29 would
prevail because it was passed later in time. *Kunzig v Liquor Control
Comm*, 327 Mich 474, 480; 42 NW2d 247 (1950).

districts that are least able to afford it, because those
are the districts who receive unrestricted aid not pro-
tected by art 9, § 29. The latter portion of this is out-
dated in light of the substantial reform in school
financing made by adoption of Proposal A at the gen-
eral election on March 15, 1994, amending art 9, §§ 3,
5, 8, and 11. The rest of the argument is answered by
the fact that the state would be free to reduce or
eliminate state mandates and, thus, reduce its obliga-
tions under art 9, § 29.

### IV. ATTORNEY FEES

Defendant argues that the Court of Appeals erred
when it concluded that attorney fees are included in
"costs" recoverable by a successful taxpayer in a suit
under art 9, § 32:

> Any taxpayer of the state shall have standing to bring suit
> in the Michigan State Court of Appeals to enforce the provi-
> sions of Sections 25 through 31, inclusive, of this Article
> and, if the suit is sustained, shall receive from the applic-
> able unit of government his costs incurred in maintaining
> such suit.

We have recently addressed this question in
*Macomb Co Taxpayers Ass'n v L'Anse Creuse Public
Schools*, 455 Mich 1; 564 NW2d 457 (1997). For the
reasons stated there, we affirm the award of attorney
fees.

We note that plaintiffs submitted their claim for
costs before the Special Master. Defendants disputed
whether all the costs were incurred regarding matters
on which plaintiffs' suit was "sustained." The Special
Master issued a decision with regard to all cost issues
up to the date of his decision, June 16, 1995. The
decision gave substantial relief to defendants on the

issue raised. We further note that defendants did not appeal that recommendation in the Court of Appeals or here. We regard that amount as finally resolved. Costs incurred after June 16, 1995, remain open.

### V. REMEDY

This is the first case of underfunding under art 9, § 29 to come to judgment. After oral argument, we directed the parties to brief questions related to the remedy. Having received and considered the briefs of the parties and amici curiae, we are convinced that the correct remedy is not full compensatory damages for underfunding for the plaintiff school districts, the basis of the Court of Appeals judgment. While we anticipate that monetary relief typically will not be necessary in future § 29 cases, defendants' prolonged recalcitrance in this case necessitates a substantial recovery aimed primarily at providing a remedy for the harm caused by underfunding.

### A

We begin, as always, with the words of the constitution, in this case, art 9, § 32:

> Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

The question is what did the great mass of the people intend in directing the Court of Appeals "to enforce" § 29. While we must answer this question from the perspective of the voters in 1978, we would be foolish if we did not keep in mind all the questions

that this Court and the Court of Appeals have had to address and resolve in reaching the point of judgment. See "History of Proceedings" above and the prior decisions in this case. For instance, it would be a fiction to say that the great mass of the people anticipated use of special masters to enable the Court of Appeals to act as a trial court or that the people had in mind the *Schmidt* formula as the way to alleviate idiosyncratic differences in state funding of the same activity in different school districts. We conclude that the people's directive "to enforce" § 29 was intended as a general directive, giving the Court the duty and authority to enforce § 29 in the way that would most effectuate the balances struck by the people in the Headlee Amendment.[31] We have followed that directive in the past and now must apply it to the remedy in this case.

Art 9, § 32 authorizes taxpayers to file suit in the Court of Appeals to enforce the provisions of § 29. As arduous as the proceedings in this case have been, we have succeeded in deciding many points of law that will guide future decisions. Thus, there is every reason to hope that future cases will be much more straightforward. We anticipate that taxpayer cases filed in the Court of Appeals[32] will proceed to rapid decision on the issue whether the state has an obliga-

---

[31] This grant of authority in the specific authorization of suits to enforce the provisions of art 9, §§ 25 through 31 waives sovereign immunity.

[32] The Legislature has authorized taxpayers to file Headlee cases in circuit courts, MCL 600.308a; MSA 27A.308(1). It has also created, but never funded, a forum for local units of government to file claims for underfunding, the Local Government Claims Review Board (LGCRB). MCL 21.240; MSA 5.3194(610). Cases filed in those fora are not before us. In particular, we note that the Legislature circumscribed the power of the LGCRB with the requirement that any award be subject to an appropriation adopted by

tion under art 9, § 29 to fund an activity or service. The Court of Appeals would give declaratory judgment on the obligation of the state. If there was such an obligation, we anticipate that the state would either comply with that obligation no later than the next ensuing fiscal year, unless it could obtain a stay from this Court, or remove the mandate. In such an instance, we anticipate that the obligation of the Court to enforce § 29 would not include any grant of money damages. This is not such a case. We turn to the proper remedy in this case.

B

Declaratory relief coupled with an award of damages is appropriate in this case as a result of the prolonged "recalcitrance" of the defendants, and the damage award can, on this basis, be limited to the years 1991-1994.[33] Any other remedy, particularly one that would grant declaratory relief alone, would authorize the state to violate constitutional mandates with little or no consequence. The intent of the people in enacting art 9, § 32 of the Michigan Constitu-

concurrent resolution of both houses of the Legislature before any administrative claim could be paid. MCL 21.240(4); MSA 5.3194(610)(4).

[33] In 1990, the Court of Appeals first determined that special education, special education transportation, driver's education, and school lunch and supplemental milk programs were state-mandated activities within art 9, § 29. *Durant, supra,* 186 Mich App 83. Despite a judicial determination that the services were state-mandated, the state continued to evade its obligation to fund these services after 1990. Thus, damages should begin to accrue in 1991, the first year after the Court of Appeals ruled on the issue of liability in this case. 1994 saw the adoption of Proposal A which authorized an increase in the state sales tax for use in school aid while at the same time limiting the use of local property tax for school purposes. After the adoption of Proposal A, the taxpayer burden to compensate for state underfunding of mandated services was greatly decreased, thus limiting the harm to the taxpayer after this point. Accordingly, the damage award should run only through the year 1994.

tion was not to enact a constitutional provision that could not be effectively enforced.

The enactment of art 9, § 29 evidenced an intent on the part of the electorate to limit the Legislature's ability to shift funding obligations for state-mandated services from the state to local government, after state revenues were limited by the Headlee Amendment, in an effort to save the state money it would otherwise have been obligated to expend. *Durant, supra,* 424 Mich 379. One of several implementing acts under the general provision of art 9, § 25,[34] § 29 of the Headlee Amendment provides:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18.

---

[34] Art 9, § 25 summarizes the substantial revenue and tax limitations the Headlee Amendment placed on state and local units of government. Section 25 provides:

> Property taxes and other local taxes and state taxation and spending may not be increased above the limitations specified herein without direct voter approval. The state is prohibited from requiring any new or expanded activities by local governments without full state financing, from reducing the proportion of state spending in the form of aid to local governments, or from shifting the tax burden to local government. A provision for emergency conditions is established and the repayment of voter bonded indebtedness is guaranteed. Implementation of this section is specified in Sections 26 through 34, inclusive, of the Article.

Although a remedy was not established under the express provisions of § 29, the need for a remedy for harm occasioned by a violation of § 29 was indeed considered and approved by the public by way of art 9, § 32. In accordance with that provision:

> Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

By authorizing the Court of Appeals to "enforce" the provisions of §§ 25 through 31, the people meant to authorize monetary damages when damages would be necessary to enforce compliance. The common understanding of the term "enforce" is "[t]o compel observance of or obedience to . . . [to] reinforce; to make strong." *The American Heritage Dictionary: Second College Edition* (1982). A constitution is made of the people, by the people, and for the people; " '[t]he interpretation that should be given it is that which reasonable minds, the great mass of the people themselves, would give it.' " *Traverse City School Dist, supra* at 405. The term "enforce" would be interpreted by the mass of people to require a remedy that would "compel observance of or obedience to" the constitutional mandate. Simply put, if declaratory relief is not sufficient to compel obedience to the constitutional mandate, and it was not in the present case, then the electorate has authorized that additional relief be granted.

Even if one departs from the common understanding of the people and examines declaratory judgment as practiced in the courts, the result is the same:

declaratory judgment actions can result in monetary relief. Actions for declaratory relief are intended to minimize avoidable losses and the unnecessary accrual of damages.[35] MCR 2.605 authorizes declaratory relief where other relief is also available. "The existence of another adequate remedy does not preclude a judgment for declaratory relief in an appropriate case." MCR 2.605(C). MCR 2.605(F) provides that "[f]urther necessary or proper relief based on a declaratory judgment may be granted, after reasonable notice and hearing, against a party whose rights have been determined by the declaratory judgment." The choice to use declaratory relief is discretionary, yet declaratory relief is cumulative relief, not intended to be exclusive or extraordinary.[36] The Michigan Court Rules contemplate that, after entry of a judgment for declaratory relief, additional relief may be granted if necessary or proper, against any party whose rights were determined by the declaratory judgment.[37] As provided by MCR 2.605(F), reasonable notice and a hearing are necessary for the granting of additional relief. Parties to this case have had both reasonable notice and a hearing on the issue of rem-

---

[35] See, generally, 10A Wright, Miller & Kane, Federal Practice and Procedure, Civil 2d, § 2751, p 568.

[36] See Wright, Miller & Kane, § 2758, p 620.

[37] See Honigman & Hawkins, Michigan Court Rules Annotated, (1963, 1984 Supp), p 690. MCR 2.605 is comparable to GCR 1963, 521. Like MCR 2.605, GCR 1963, 521 provided that further relief based on a declaratory judgment may be granted when necessary or proper. Because GCR 1963, 521 was adopted long before the Headlee Amendment was passed, and clearly indicated that declaratory relief and an award of damages are both appropriate under the court rules and have been since 1963, it is not unreasonable to award further relief, including damages, in the instant case.

edy,[38] and there is no reason to limit the remedy to declaratory relief alone. Given the facts of this case, the people who enacted this amendment would conclude that to require only declaratory relief would be to negate, rather than effectuate, the protection intended by § 29.

Having concluded that damages are not precluded where declaratory relief is used, we further conclude that the instant case is one in which damages are "necessary or proper." The prolonged "recalcitrance" of the state in shirking its obligations to fund state-mandated services clearly cannot be cured by declaratory relief alone. Had it been possible to resolve this issue by declaratory judgment, the state would have funded the services in question after the 1990 Court of Appeals decision, while at the same time seeking a declaratory judgment from this Court on its continuing obligation under the Headlee Amendment to fund those services.[39] Having chosen instead to ignore the Court of Appeals ruling, we see no choice but to award damages against the state.

---

[38] Indeed, the defendants would be in no position to complain over any judgment less than the full amount required by the Court of Appeals because defendants did not seek leave to appeal on the form or amount of the remedy or raise any issue concerning the remedy until this Court raised the matter, sua sponte.

[39] Although we anticipate that monetary relief will be atypical, we do not mean to suggest that damages are only appropriate under art 9, § 32 when a party has failed to observe a judicial decree. What we are suggesting is that declaratory relief alone may be the appropriate method of "enforcing" § 29, particularly in cases of new mandates where the lack of entrenched obligations gives units of local government fairly free choice not to commence an unfunded state mandate. However, because of the state's failure to observe the 1990 Court of Appeals determination, additional remedy became a necessary and proper means of enforcing the constitutional mandate.

To deny monetary relief here might provide incentive for protracted litigation in the future. Here, defendants did not interject the issue on which most of the damages turned (special education, issue I) until eight years into the litigation.[40] The argument, when raised, contradicted prior statements by defendants (that special education was a state mandated activity under Headlee). The argument was not based on the language of Headlee. When the Court of Appeals resolved that issue against defendants, defendants declined to honor the Court of Appeals decision for almost seven years.

C

We now turn to the question of who should receive the judgment. The Headlee Amendment is a taxpayers' amendment. Art 9, § 29 was adopted to allow local taxpayers freedom from constant pressure to approve increases in local property taxes to pay for activities forced on local units of government by the state government and the benefit of local government discretion on how to spend local tax revenues. Instead of having that freedom, plaintiff taxpayers had to dedicate literally hundreds of millions of dol-

---

[40] Before that time, defendants had argued in a brief to this Court that special education was a state-mandated activity under art 9, § 29. Also before raising the special education issue, the Legislature began funding one hundred percent of the "necessary costs" of local and intermediate school district compliance with revisions in the "administrative rules for special education" that became effective July 1, 1987. 1987 PA 220, subsection 51(3), MCL 388.1651(3); MSA 15.1919(951)(3). These actions refute defendants' argument that any monetary relief should be prospective because defendants could not reasonably have anticipated that the Court of Appeals and this Court would hold that § 29 applies to special education.

lars[41] of local tax revenues from 1979-80, the first year Headlee was in effect, until 1994-95. Then, in the aftermath of the people's approval of Proposal A,[42] the Legislature overhauled the method of financing schools to substantially reduce dependence on local taxation.[43] This shift substantially reduced the pressure on local taxpayers to make up for state underfunding of mandated activities.

To deny taxpayers relief would be to deny the reality that they have suffered real dollar losses throughout this protracted litigation. It would also ignore that, where the Headlee Amendment anticipated specific compliance problems, it provides specific relief for the taxpayers.[44]

While the Headlee Amendment is a taxpayers' amendment, the requirement of § 29 adopted by the people does not directly mention the taxpayers. It directly protects the units of local government. It serves the overall purpose of the people by protecting units of local government from actions of the state government in foisting underfunded and unfunded mandates on local government, thus frustrating local discretion over local tax revenues. In this case, the underfunding certainly affected the level of regular educational services that the locally elected and, until

---

[41] Without interest, the judgment of the Court of Appeals, through 1993-94 was approximately $350 million. We do not have reasonably accurate estimates for the three years since then.

[42] Proposal A was adopted at a statewide election on March 15, 1994. It authorized an increase in the state sales and use tax for use in school aid, limited use of local property taxes for school purposes, and authorized other changes in school finance.

[43] Defendants indicate that the state share of the costs of K-12 education increased from thirty-five percent to eighty percent and the local share fell from sixty-five percent to twenty percent.

[44] See art 9, § 26, providing for a pro-rata tax refund if the state collects excessive revenue, and § 31, providing for a decrease in the millage rate if a local taxing authority broadens the base of a tax or increases the assessed value of property faster than allowed by that section.

1994, mostly locally funded boards of education could provide to all current students and many who have graduated or dropped out over the last almost two decades. Local boards have been faced with a dizzying variety of choices on how to deal with underfunding and rising costs. Many, perhaps most, districts have had larger class sizes. Others have dropped programs such as elementary music. Perhaps none have had as much access to computer equipment as they would have liked. Many may have had no money for targeting and helping potential dropouts. The potential list is endless. While there is no way at this remove to compute with exactitude the number of sacrifices suffered by the general education population, we are sure that the sacrifice has been significant and its effect continuing. These students, no less than taxpayers have suffered the adverse consequence of defendants' underfunding.

While we conclude that plaintiffs must be given some relief in this case, we also conclude that affirming the full judgment of the Court of Appeals would be inconsistent with the balances struck by the Headlee Amendment and by Proposal A. Any judgment would be paid out of state funds, collected from state taxpayers. The taxpayers of the eighty-four districts represented by plaintiff taxpayers are, in turn, state taxpayers. State taxpayers were also to be protected by provisions of the Headlee Amendment, albeit not § 29. There is a point at which granting more relief to the local taxpayers creates more potential for harm to the state taxpayers than it would provide additional benefit to the local taxpayers. Our aim is to give the local taxpayers and students meaningful redress (to "enforce" § 29) without undermining the current security enjoyed by the state taxpayers.

D

We affirm that portion of the Court of Appeals judg-
ment that awards money damages, without interest,[45]
to plaintiff school districts for the full amount of
underfunding to each district during 1991-92, 1992-93,
and 1993-94.[46] We conclude that any award of dam-
ages should be distributed to the plaintiff school dis-
tricts and apportioned to taxpayers within each dis-
trict, if appropriate. Unlike the dissenters, who
express concern over awarding monetary relief to
taxpayers, we are not concerned that taxpayers are
not appropriate parties to receive an award. Headlee
is fundamentally a taxpayers' amendment, enacted for
the primary purpose of relieving the electorate from
overwhelming and overreaching taxation. Who better
to receive a monetary award than those who the
amendment was enacted to protect?

Although we have no concern regarding the cor-
rectness of awarding damages to the taxpayer, we
stop short of ordering any particular method of distri-
bution because each of the affected districts and its

---

[45] This action is not the type of civil action at law covered by MCL
600.6013; MSA 27A.6013, which provides for pre- and postjudgment inter-
est. Money judgments against the state in the Court of Claims are subject
to postjudgment interest, MCL 600.6455; MSA 27A.6455, but this case was
not, and under art 9, § 32, could not be filed in the Court of Claims. Given
that the voters have left it to the Court to develop the proper remedy, we
believe that this case is closer to an equitable action than an action at law.
In equitable actions, an award of interest is discretionary. *Cyranoski v
Keenan*, 363 Mich 288, 294-295; 109 NW2d 815 (1961). The balance we
have struck between the rights of the local taxpayers and the interests of
the state taxpayers would be upset by an award of interest preceding the
date of this opinion.

[46] We begin this period with the first year after the Court of Appeals
ruled on the issues of liability in this case. Before that point, defendants
had not had a ruling from the Court. We end it with the change in the
method of financing public education. After the change, local taxpayers
are much more likely not to have suffered harm.

respective taxpayers have sustained discrete harms that are beyond the capability of the Court to evaluate. Instead, we award damages to the plaintiff school districts with the expectation that the democratic process will inform and shape distribution of the award. In so doing, each board of education will exercise its discretion to determine and tailor its award in a manner that best fits the needs of its constituents. Appropriate remedies include, but are not limited to, distributing the award to taxpayers in relation to the amount of increased taxes they paid during 1991-92, 1992-93, and 1993-94 as a result of the increase in millage over base year 1978-79, due to underfunding, distributing the award to all property-owning taxpayers, to all local taxpayers, or use of the award by the district for other public purposes. We have full confidence that the checks and balances of democratic decision making in each local unit of government will effectively assess the harm to be redressed and the method of addressing it.

E

Justice BRICKLEY makes a number of thoughtful points in his dissent from our decision to award money damages in this case which deserve a response.

The dissent accurately notes that § 29 does not specify the remedy for a violation of its requirements. Rather, § 32 provides the remedy that the courts "enforce" §§ 25 through 31. It states that the ordinary person would read "to enforce" in the context of § 29 as conferring authority on the court to order the state to fund the activity in the future or to enjoin the state

from requiring the local unit of government to provide the service.

We think this analysis unnecessarily focuses the question of the scope of enforcement under § 32 on problems which might arise under § 29. The ordinary person reading § 32 would view a broader range of measures appropriate to the wide range of possible violations of §§ 25 through 31. A good example is found in the suit involved in *TACT v Wayne Co*, 450 Mich 119; 537 NW2d 596 (1995). There, the defendant increased its real estate transfer tax without a vote of the people. Plaintiff paid the increased tax when selling property and later filed a class action for declaratory and injunctive relief as well as refunds. The question before this Court concerned the application of the one year period of limitation, MCL 600.308a; MSA 27A.308(1), not the propriety of a refund. Nonetheless, the obvious merit of that remedy led us to conclude, "Taxpayers may sue for a refund within one year of the date the tax was assessed." 450 Mich 125.

The point is that § 32 does not mention a refund for taxes unconstitutionally collected under § 31. Yet the remedy of a refund is so obvious that the ordinary person would say that, without such a remedy, the court would not be enforcing § 31. We continue to be of the belief that the command of § 32 is general and empowering and contemplates a money judgment where necessary.

The dissent also cites the Missouri case, *Fort Zumwalt*, as support and we do not dispute that there is some support for the partial dissent there. We note, however, that the dissent significantly disagrees with *Fort Zumwalt*. The partial dissent is willing to issue an order to the state to fund the activity in question.

The Missouri court was only willing to free the local unit of government from the duty to obey the state mandate. While this might be effective relief for new mandates, it would hardly be practicable in the case of a continuing mandate such as special education where the school districts are under contract with thousands of staff, have massive capital investments and have established portions of the student body relying on the continuity of services.

In replying to our opinion, the dissent indicates that the people ratifying the Headlee Amendment would have anticipated situations, under § 29, when the state might pass a new mandate without funding or reduce funding for an existing mandate and that the people would have further anticipated an expeditious order to end the violation. Again, we have no disagreement with the basic point. For that reason, we do not foresee a likely need for money relief for cases filed in the future. However, what happened here was not one of the situations which the people may have anticipated. Here, the state interposed a new legal argument eight years into the litigation and refused to abide by rapid rejections of that argument by the Special Master and Court of Appeals. The question is not so much what violations the people might have anticipated, but whether the people intended the court to provide a remedy when things did not go as anticipated. We think the people's use of the emphatic word "enforce" shows their intent that the courts provide effective remedies for unanticipated as well as anticipated problems.[47] Our remedy here, rather than

_____

[47] Indeed, §§ 26 and 31 provide corrective measures for three anticipated problems. The directive of § 32 is that the courts enforce §§ 25 through 31, not just the two sections that listed anticipated problems.

being idiosyncratic, is tailored to fit what we hope is a very unusual violation.

The dissent observes, accurately, that the remedy in this case has been fashioned, in part, because the state has been derelict for so long in its duty. The history of defendants' conduct justifies the conclusion that the state has been derelict too long. Not only did defendants argue to this Court in 1985 that we ought to hold that § 29 applied to specific activities like special education (in order to escape a larger burden for education as a whole) but, having received the favorable response on the larger burden, they reversed their position on special education. Even when defendants got a ruling from the Court of Appeals on the special education issue fairly promptly after defendants first raised it, defendants did not comply with that ruling, insisting on a ruling by this Court. While the pendency of appeals and further trial proceedings to establish the amount of injury gave defendants an opportunity to take the risk that we might eventually take the case and reverse the Court of Appeals, the cost of that risk and the cost of noncompliance should be borne by defendants. Defendants' ignoring the existence of the Court of Appeals ruling through the last seven years while technically not contemptuous, surely falls short of the respect we should demand for that Court.

The dissent argues that the appropriate response is political, not judicial. The suggestion that the appropriate response is political ignores both the fact that the state's dereliction has persisted through three administrations and the fact that the people have directly ordered the courts to enforce § 29.

The dissent notes, with some eloquence, the tension that flows from the fact that local taxpayers are also state taxpayers. It is this tension that has caused us to conclude that we should not affirm the entire judgment of the Court of Appeals that would be approaching $800,000,000.00. Instead, we limit the award to an amount which should be slightly over a quarter of that. What the dissent fails to acknowledge is that tension is created by the opposition of two forces. In trying to accommodate the interests of state taxpayers, it forfeits completely the interests of the local taxpayers and their local government, as if it were advising a holder of a mutual insurance policy not to file a claim because it would reduce the worth of the insured's interest in the company. Given the amounts involved, our judgment is sufficient to give meaningful recovery to plaintiffs without adding costs for individual state taxpayers.

The dissent argues that the Court may do no more than interpret the law and we "must presume that the other branches of government, once informed of their constitutional duties, will execute them to the letter and the spirit of the law." We reply that § 32 requires that we "enforce"—not just interpret—§ 29. We note that defendants were fully aware of their constitutional duties in 1985 when they advised us that special education is a mandated service within the meaning of § 29.

The dissent minimizes the continuing effect that underfunding has on the continuing operation of plaintiff school districts, while it acknowledges that regular education programs have probably been reduced to divert local resources to cover the state underfunding. All students in plaintiff school dis-

tricts have, for their entire careers as students, been potentially subject to innumerable consequences of local budgetary constraints, such as: larger class sizes, decreased access to librarians, loss of enrichment programs, use of outdated books and archaic physical plants and delays in purchase of new equipment, for instance computers. While we can no more quantify the dollar value of these losses than we can give an objective figure to recompense the loss of an arm, we regard this harm as real and deserving of relief.

The dissent argues, "Although taxpayers may have had their millage increased at a local level, all Michigan taxpayers benefited from lower state taxes made possible, in part, by the state's declining responsibility for special education costs." Thus, "taxpayers did not necessarily suffer 'real dollar losses.'" This argument is no more than a judicial disagreement with the electorate over the validity of the policy behind § 29. In § 29, the people have said that shifting of the tax burden to local taxpayers is a matter of constitutional dimension; it is banned; and, through § 32, the ban must be enforced. The people having spoken through their constitution, the policy debate is no longer open.

Lastly, the dissent indicates that "the local taxpayer would not want this kind of relief." We believe the taxpayers would appreciate relief both in the form of a direct benefit to plaintiffs and, as the electorate which adopted Headlee, with the courts' willingness to abide by the direction to enforce § 29.

F

We are acutely conscious of the limitations of judicial competence in developing workable standards to regulate government conduct. We acknowledge also that the Legislature, no less than this Court, interprets the document that binds both institutions and is obligated and entitled to make its own good faith judgments regarding the implications of the Headlee Amendment when enacting policy as the people's representatives. However, for the reasons stated above, we find the only viable remedy to be one that awards declaratory relief coupled with monetary damages for the years 1991-1994. In this way, "the great mass of people" will be better assured that the Court effectively "enforced" the provisions of art 9, § 29.

213 Mich App 500 affirmed except as to remedy; remedy affirmed in part.

MALLETT, C.J., and CAVANAGH, BOYLE, and KELLY, JJ., concurred.

BRICKLEY, J. (*concurring in part and dissenting in part*). I agree with the reasoning of the majority opinion in parts I, II, III, and IV. However, I respectfully dissent from the majority's decision in part V regarding the remedy it contends is authorized by the Michigan Constitution under art 9, § 32. Although I appreciate the appeal of awarding financial relief to the school districts for the amount of the state's shortfall from fiscal years 1991-92, 1992-93, and 1993-94, I do not believe that we have the power to create this solution under art 9, § 32. I would apply the provision as written and order the state of Michigan henceforth to meet its financial obligations under art 9, § 29 by paying its proportionate share of the cost for special edu-

cation and for the state lunch program. This Court does not have authority to order monetary damages for a violation of § 29 of the Headlee Amendment because § 32, the enforcement provision, only gives the courts authority to order declaratory relief.

ANALYSIS

I. REMEDY FOR A VIOLATION OF ART 9, § 29

The people enacted art 9, § 29 to forestall any attempt by the Legislature to shift financial responsibility for services to the local government once the state's revenues were limited by other provisions of the Headlee Amendment. *Durant v State Bd of Ed*, 424 Mich 364, 379; 381 NW2d 662 (1985). Section 29 provides in full:

> The state is hereby prohibited from reducing the state financed proportion of the necessary costs of any existing activity or service required of units of Local Government by state law. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the legislature or any state agency of units of Local Government, unless a state appropriation is made and disbursed to pay the unit of Local Government for any necessary increased costs. The provision of this section shall not apply to costs incurred pursuant to Article VI, Section 18.

Examined by itself, this section only describes the obligations of the state for financing new and existing services that it mandates. There is no description in § 29 of a remedy for a violation of these obligations.

The purposes of this section are vindicated by the general enforcement provision, art 9, § 32, which provides a general statement regarding the implementation of the different sections of the Headlee Amend-

ment, §§ 25 through 31. Section 32 of art 9 states in full:

> Any taxpayer of the state shall have standing to bring suit in the Michigan State Court of Appeals to enforce the provisions of Sections 25 through 31, inclusive, of this Article and, if the suit is sustained, shall receive from the applicable unit of government his costs incurred in maintaining such suit.

Section 32 does not anticipate that the Court will order the state, under art 9, § 29, to pay a school district, or the taxpayers of that school district, the cost of complying with a state mandate from past years. Rather, the provision only appears to contemplate the fact that the Court will issue an order directing the state to pay its proportionate share of the necessary costs of the state-mandated activity.

This conclusion is not only supported by the language of the amendment, but also by the fact that the people expressly included a financial remedy in a different provision, § 26. Section 26 creates a ceiling for the level of taxes the state may impose by limiting the total revenue the state may generate. In § 26, the people established a *refund* in the event that the state exceeded its revenue limit by more than one percent:

> For any fiscal year in the event that Total State Revenues exceed the revenue limit established in this section by 1% or more, *the excess revenues shall be refunded pro rata* based on the liability reported on the Michigan income tax and single business tax (or its successor tax or taxes) annual returns filed following the close of such fiscal year. If the excess is less than 1%, this excess may be transferred to the State Budget Stabilization Fund. [Emphasis added.]

Similarly, § 29 could have included a guarantee for monetary relief for the taxpayer if the state failed to pay for its mandated services. There is a maxim of construction that *expressio unius est exclusio alterius*, or, in other words, the express mention of one thing implies the exclusion of similar things. *Jennings v Southwood*, 446 Mich 125, 142; 521 NW2d 230 (1994). The fact that the people included a revenue refund for a violation of § 26, but not for § 29, indicates that the people did not envision monetary relief for a violation of § 29.

This conclusion is further supported by the analysis of the Missouri Supreme Court in addressing the same issue under its constitutional amendments. See *Fort Zumwalt School Dist v Missouri*, 896 SW2d 918 (Mo, 1995). The state of Missouri adopted the virtually identical reform of its tax system in its constitution in 1980 on the basis of Michigan's Headlee Amendment. We directed the parties in our June 10, 1997, order to provide further briefing on the issue of remedy, including the issue whether declaratory relief was the appropriate relief as in *Fort Zumwalt*. The Missouri Supreme Court examined a case in which the state of Missouri had failed to provide funding for special education services (a state-mandated service) and concluded that the state was protected by sovereign immunity because its enforcement provision, art X, § 23 (the parallel to Michigan's art 9, § 32), did not authorize money damages:

Article X, Section 23, authorizes taxpayer suits to enforce the provisions of Section 21 [parallel to Michigan's art 9, § 29] without saying what remedies are available other than attorneys fees and costs. If Section 23 is a consent by the state to be sued for general money damages to enforce Sec-

tion 21, the consent exists by way of inference or implica-
tion. This Court will not infer or imply that a waiver of sov-
ereign immunity extends to remedies that are not essential
to enforce the right in question.

Other equally effective but less onerous remedies than
permitting a money judgment against the state are available
to enforce a taxpayer's interests under Section 21. Specifi-
cally, a declaratory judgment relieving a local government
of the duty to perform an inadequately funded required ser-
vice or activity is an adequate remedy. [*Fort Zumwalt,
supra* at 923.]

I agree with the basic point. There are other less
onerous remedies available to the plaintiff school dis-
tricts. We should not conclude that there is a grant of
authority to bring an action for monetary damages
against the state of Michigan without an express
statement by the people or Legislature.

## II. THE MAJORITY'S DECISION

The majority has drawn a different conclusion in
the instant case, reasoning that an ordinary person
would understand § 32's directive to enforce § 29 as
giving the Court "the duty and authority to enforce
§ 29 in the way that would most effectuate the bal-
ances struck by the people in the Headlee Amend-
ment." *Ante*, p 205. I disagree with this basic point
because it is unclear what the majority's interpreta-
tion of "enforce" means. Through this vague under-
standing of "enforce," the majority has created a
license to fashion any remedy that it deems fit. I am
convinced that the ordinary person would understand
§ 32 to only confer authority on the courts to provide
declaratory relief for a violation of § 29.

The people ratifying these amendments, in my opin-
ion, likely believed that it would be easy to identify

when the state either (1) enacted a new program but failed to provide for the funding or (2) reduced funding for an existing state-mandated service, and that the courts would then expeditiously order the end of the violation. Hence, with this understanding, there would be no reason to provide for monetary damages because there would not be a situation in which the state had failed to comply in past years. The drafters of the Headlee Amendment, and the people ratifying it, did not likely anticipate that it would take seventeen years for this Court to issue a definitive ruling on the amendment's application.

In reaching its conclusion, the majority has not attempted to root its pragmatic decision in the amendment. The majority has limited the relief to three years, 1991-92, 1992-93, and 1993-94. The Court awards a money judgment to the school districts to use for refunds to the taxpayers, tax relief, or other public purposes. This effectively gives the school districts complete discretion in deciding how to use the funds.[1] This Court has not been empowered, in my

---

[1] The majority provides the boards of education of the school districts the discretion on how to spend this award and relies on the democratic process to safeguard that they shall do so wisely:

We conclude that any award of damages should be distributed to the plaintiff school districts and apportioned to taxpayers within each district, *if appropriate. [Ante,* p 214 (emphasis added).]

\*       \*       \*

[W]e [authorize distribution of money damages] to the plaintiff school districts with the expectation that the democratic process will inform and shape distribution of the award. In so doing, each board of education will exercise its discretion to determine and tailor its award in a manner that best fits the needs of its constituents. Appropriate remedies include, *but are not limited to,* distributing the award to taxpayers in relation to the amount of increased taxes they paid during 1991-92, 1992-93, and 1993-94 as a result of

opinion, to create this novel solution. By virtue of the fact that the majority apparently only intends to apply this ruling to plaintiffs in this controversy, the majority reveals the idiosyncratic nature of its decision. The majority has improperly arrogated to itself the power to fashion what it believes to be a fair remedy.

Moreover, I am not persuaded that the result is consistent with the basic point of the Headlee Amendment, which is to provide relief for taxpayers. See *Durant, supra* at 378. The majority has indicated that it anticipates that this monetary relief "typically will not be necessary in future § 29 cases." See *ante*, p 204. In other words, these eighty-four school districts will receive the benefit of a monetary damage award for the underfunding for these three years but no other school districts will. This relief will come from the state, and, thereby, it will come from all the taxpayers of the state. In other words, the practical effect of this relief is to give these school districts relief at the expense of the taxpayers of the rest of the state.

The majority's decision to only give tax relief to these taxpayers suggests to me that the majority is really punishing the state of Michigan for its dereliction in failing to meet its obligations. See *ante*, p 204.[2]

---

the increase in millage over base year 1978-79, due to underfunding, distributing the award to all property-owning taxpayers, to all local taxpayers, *or use of the award by the district for other public purposes.* We have full confidence that the checks and balances of democratic decision making in each local unit of government will effectively assess the harm to be redressed and the method of addressing it. [*Ante*, p 215 (emphasis added).]

[2] In fact, the majority almost expressly stated this point:

While we anticipate that monetary relief typically will not be necessary in future § 29 cases, *defendants' prolonged recalcitrance in*

Although I believe that the state must meet its constitutional duties, if there is a fear that the state may fail to comply in the future because we are only able to give declaratory relief, I believe that the appropriate response is political, not judicial.

The sad irony of this final chapter in the *Durant* saga is that the result of the "taxpayers revolt"—the 1978 Headlee Amendment—is an award of damages against the taxpayers of Michigan. Whether the Court awards damages to the school districts, local taxpayers, or both, state taxpayers will ultimately foot the bill. The magnitude of the Court's judgment is staggering. The Court awards $211 million to the plaintiff school districts. And yet, not even a single child has claimed to have been denied special education services during the pendency of this lawsuit.

Although I acknowledge the state's "prolonged recalcitrance" in resolving this matter, it hardly justifies foisting what may be the largest damage award in state history upon the very parties—taxpayers—that the Headlee Amendment was intended to protect.

The Court's award of damages rests uneasily on the following two arguments. The first is that

> [t]o deny taxpayers relief would be to deny the reality that they have suffered *real dollar losses* throughout this protracted litigation. [*Ante*, p 212 (emphasis added).]

With the best of intentions, the Court aspires to give relief to taxpayers for their "real dollar losses." However, this justification overlooks one simple fact: local

---

*this case necessitates a substantial recovery* aimed primarily at providing a remedy for the harm caused by underfunding. [*Ante*, p 204 (emphasis added).]

taxpayers are state taxpayers. A damage award against the state is a damage award against the state taxpayer. Contrary to the majority's apparent belief, taxpayers cannot be compensated by making them pay money to themselves.

The same principle that explains why a damage award against the state cannot give taxpayer relief—local taxpayers are state taxpayers—also suggests another fact. State taxpayers benefited from the state's ability to shift special education expenses to the local level. In other words, even though a taxpayer's local millage may have risen, that taxpayer was also enjoying the benefits of reduced state spending, which resulted in a lower state tax burden. Thus, as the local tax burden rose, the corresponding state tax burden fell. Therefore, it would appear that the net effect of declining state special education funding on taxpayers was neutral. Accordingly, the majority's reliance on the "real dollar losses" of local taxpayers is misplaced.

The majority's second reason for requiring the taxpayers to, in effect, pay for special education twice is that

> [t]o deny monetary relief here might provide incentive for protracted litigation in the future. [*Ante*, p 210.]

This argument assumes that it is the Court's role to remove "incentives" for protracted litigation on the part of the state. The Court's place is to interpret the law, not to guide, control, or direct the activities of the other branches of government. We must presume that the other branches of government, once informed of their constitutional duties, will execute

them to the letter and spirit of the law. In the unfortu-
nate event that they choose to diverge from their
explicit constitutional obligations, the remedy must
be political, not judicial.

Further, in its attempt to exact a penalty from the
state for its transgressions, the Court inadvertently
punishes the taxpayer, the party who will ultimately
pay the bill in this case.

The school districts' claim to damages is uncon-
vincing because the school districts exist in a repre-
sentative capacity, acting on behalf of local taxpayers
and students. Because a school district stands in rela-
tion to the state as does a subsidiary to its parent cor-
poration, it does not have an inherent right to dam-
ages. Its claim to damages can only be as worthy as
that of whom it represents, the students and the tax-
payers. For divergent reasons, neither of these groups
warrants financial relief.

The students can be organized into two groups on
the basis of the educational services they received—
special education and general education. Special edu-
cation students were not affected by reduced state
funding because each of the school districts made
accommodations in other areas to ensure that special
education programs met state requirements. For
example, the school districts may have increased
local millages or cut other programs.

General education programs, on the other hand,
may have suffered cutbacks resulting from the shift-
ing of resources from general education to special
education. In such cases, however, it is impossible to
unring the bell, given the passage of time. Those gen-
eral education students who were affected have
moved ahead to the next grade, and many have been

graduated. Indeed, many of these new graduates will
be helping to pay for the state's "prolonged recalci-
trance." Notwithstanding the folly of trying to esti-
mate the value of such damages, retroactive damages
simply cannot replace a missed educational
opportunity.

Thus, the school districts can have no claim to
damages through the taxpayers they represent.
Although taxpayers may have had their millages
increased at a local level, all Michigan taxpayers ben-
efited from lower state taxes made possible, in part,
by the state's declining responsibility for special edu-
cation costs. Consequently, as discussed above, tax-
payers did not necessarily suffer "real dollar losses."

Michigan voters, through their elected representa-
tives, have chosen to maintain a system of special
education that is a model for the rest of the country.
By deciding to have such an exemplary program, the
citizens of this state also agreed to pay for it. That the
money for special education came from the average
citizen's "property tax pocket," as opposed to his
"state income tax pocket," makes little difference to
his net worth. The reality is that the programs were
paid for once, albeit not at the constitutionally pre-
scribed level of government.

It is undisputed that those programs were main-
tained during the pendency of this lawsuit. Local tax-
payers paid for them, either through higher local
taxes or reduced regular education programs. Award-
ing damages to the school districts asks the taxpayers
to pay for those programs a second time.

Even though local taxpayers may receive token
payments from their school districts, everyone knows
where the funds for those payments come from: the

State Treasury, which is funded by tax dollars. The state taxpayer will also be funding the administrative costs to distribute this "relief."

In my view, the taxpayer can do without this kind of relief. Most likely, the local taxpayer would not want this kind of relief, especially when that "relief" comes out of his own pocket—deducting, of course, administrative expenses. The sure, simple, and most direct way in which to give the taxpayers relief is to award a declaratory judgment. This acknowledges the state's future obligations under the Headlee Amendment. It also recognizes that this lawsuit is simply not susceptible to damages. And, it avoids a misguided, cumbersome award of damages that confers no net benefit on the taxpayers. Instead, the majority's remedy will punish the Michigan taxpayers whom the Headlee Amendment was intended to protect, by requiring an increase in state taxes, cuts in state programs, or both.

Accordingly, this Court should limit the scope of its relief to a declaratory judgment for the plaintiffs.[3]

RILEY and WEAVER, JJ., concurred with BRICKLEY, J.

WEAVER, J. (*concurring in part and dissenting in part*). I concur with the reasoning and result of the majority opinion parts I, II, III, and IV. I dissent from the majority's proposed remedy and instead concur with Justice BRICKLEY's reasoning and conclusion that a declaratory judgment is appropriate in these consolidated cases.

I write separately to add that I believe that declaratory judgment is the best way to insure that the tax-

---

[3] *Fort Zumwalt, supra.*

payers are not forced to carry the burden, *for a second time*, of the underfunded mandates. Further, if the majority wishes to insure taxpayer relief, see *ante*, p 216, with their judicially created, arbitrary award of money damages, it should mandate that the school districts directly return all the money damages to the taxpayers rather than rely on "the expectation that the democratic process will inform and shape distribution of the award." *Ante*, p 215. The majority's instructions leave the door open for a recalcitrant or well-meaning school district not to refund even a penny to the taxpayer and to create for itself a windfall from the money damages. Meanwhile, the average taxpayer on the street (who may not even know about the case and probably at most will be entitled to a $100 refund) will have neither the knowledge, the time, nor the energy to try through "the democratic process" to get a refund that the majority says he is entitled to without having to argue with the school board or file another lawsuit.[1]

The "democratic process" has already made clear, through the taxpayer-initiated enactment of the Headlee Amendment and through Proposal A, that the taxpayer is tired of being burdened by state and local governments.

---

[1] Contrary to the majority's misleading statement, *ante*, p 214, that the dissenters believe that the taxpayers are not the appropriate recipients of monetary relief in these cases, it is precisely the taxpayer's wallets that the dissenters seek to relieve with a declaratory judgment. A declaratory judgment insures that the taxpayers will not pay a second time for services already received.