FORT ZUMWALT SCHOOL DISTRICT,
et al., Appellants,

v.

STATE of Missouri, et al., Respondents.

No. 76861.

Supreme Court of Missouri,
En Banc.

April 25, 1995.

Richard J. Pautler, Thomas E. Tueth, Celynda L. Brasher, St. Louis, for appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., Robert L. Presson, Asst. Atty. Gen., Jefferson City, for respondents.

ROBERTSON, Judge.

Article X, Section 21 of the Missouri Constitution prohibits the state

from reducing the state financed proportion of the cost of any existing activity or service required of ... political subdivisions. A new activity or service or an increase in the level of any activity or service beyond that required by existing law shall not be required by the general assembly or any state agency of ... political subdivisions, unless a state appropriation is made to pay the ... political subdivision for any increased costs.

In *Rolla 31 School District v. State,* 837 S.W.2d 1, 7 (Mo. banc 1992), we affirmed a trial court's injunction prohibiting the state from requiring a school district to provide new special education services "until the legislature provides a specific appropriation" to fund the state portion of the program. We reserved for another day the question whether a violation of Section 21 may result in a money judgment against the state in favor of a political subdivision or its taxpayers. *Id.* at 7–8.

In this case, school districts and taxpayers present that issue, claiming that the state has reduced its proportion of funding of special education services below its 1980–81 level. The trial court sustained the state's motion for summary judgment. The school districts and taxpayers appeal. Our jurisdiction is founded on Article V, Section 3 of the Missouri Constitution. The judgment of the trial court is reversed and the cause remanded.

I.

Appellants Fort Zumwalt School District, Francis Howell School District, St. Charles School District, and Wentzville School District are school districts in Missouri. Appellants Robert Fisher, Jayne Voss, Carl Hack, Barbara Hack, Teri Fricke, Keith Schulte, Richard Place and Diane Hansen are residents and taxpayers of these school districts. Respondents are the State of Missouri, the Governor, the Missouri State Board of Education, the Commissioner of Education, the Commissioner of Administration, and the State Treasurer.

Federal law offers aid to states that adopt policies and programs to assure "all children with disabilities the right to a free appropriate public education." 20 U.S.C. §§ 1400–1485, § 1412(1) (Supp.1991). Mindful of the federal carrot, Section 162.670, RSMo 1994, announces the policy of the state "to provide or to require public schools to provide to all handicapped and severely handicapped children within the ages prescribed herein, ... special educational services sufficient to meet the needs and maximize the capabilities of handicapped and severely handicapped children." Section 162.700, RSMo 1994, requires the board of education of each school district to provide special educational services for handicapped children residing in the district who are three years old or older.[1]

Section 162.975, RSMo 1994, establishes the amount of state aid to school districts for special education programs. In 1980, this section authorized $6,000.00 per class with the exception that the amount was $4,500.00 per class of educable mentally retarded (EMR) students and $3,500.00 per class for remedial reading. § 162.975.1, RSMo 1978. The section also authorized $4,000.00 for each professional staff member other than classroom teachers employed to work full time with handicapped or severely handicapped children and $2,000.00 for each full-time teacher aide. § 162.975.4–.5, RSMo 1978.

In 1986, the legislature increased the respective amounts to $11,646.00 per class, $10,500.00 per EMR class, $6,794.00 per remedial reading class, $8,000.00 for full-time professionals other than teachers, and $4,000.00 for each full-time teacher aide. § 162.975.1, .4–.5, RSMo 1986.

Section 162.975.1 prescribes annual adjustments so that these rates increase by the same percentage by which the appropriation of state funds for the school foundation program is changed from the previous year or the percentage change in per pupil operating costs, whichever is less. The plaintiffs do not claim that the state violated Section 162.975.1.

The total amount of state aid for special education increased from $60,569,207 in 1980–81 to $144,946,670 in 1992–93. Appellants admit that each of the four school districts in this case received a higher dollar amount of special education aid in 1989–90, 1990–91, and 1991–92 than they received in 1980–81. However, the school districts allege the state has unconstitutionally reduced the proportion that its reimbursement of costs bears to costs of the school districts in providing special education services.

The school districts' and taxpayers' petition sought a declaration that "the state is obligated to maintain the same proportion of categorical aid to Missouri school districts for providing special education services to school-aged residents as it did in 1980–81," and also a declaration that the state violated the provisions of Section 21 by failing to maintain that proportion in 1989–90, 1990–91 and 1991–92. The petition also sought a permanent injunction requiring the state to maintain the "same proportion of categorical aid to local school districts for special education services as it did in 1980–81." Finally, the petition sought a money judgment against the state for the amount by which the state allegedly fell short of its funding obligation under Section 21.

The parties each filed motions for summary judgment. The plaintiffs' motion sought partial summary judgment, asking the court to hold that Section 21 requires the state to pay and maintain the same percentage of funding for a specific school district as it provided in 1980, and for a declaration that Section 21 permits a money judgment against the state for the state's failure to maintain the required proportion of special education funding.

The state defendants' summary judgment motion asserted that compliance with Section 21 "cannot be determined in the context of individual school districts"; that compliance

---

1. In 1980, state law required school districts to provide special education services to children five years old or older. § 162.700, RSMo 1978. Effective July 9, 1991, Section 162.700 was amended to include children three or four years old also. In *Rolla 31*, 837 S.W.2d at 7, this Court held it was a violation of the Hancock Amendment not to fund this new requirement fully.

with Section 21 cannot be determined "on a percentage basis"; and that the state had met its Section 21 obligation because it had increased the dollar amount of state aid for funding special education.

The trial court issued findings of fact, conclusions of law and a judgment sustaining the state defendants' motion for summary judgment. The trial court concluded, among other things, that the state had "*not* reduced the level of state financing for special education" and rejected any claim that Section 21 required the state to reimburse a district's special education expenditures at a set percentage established with the passage of Section 21 in 1980.

## II.

### A.

■ The state defendants' contention that the school district defendants have no standing to enforce Article X, Section 21 claims our attention first. Article X, Section 23, provides:

> Notwithstanding other provisions of this constitution or other law, any *taxpayer* of the state, county, or other political subdivision shall have standing to bring suit in a circuit court of proper venue and additionally, when the state is involved, in the Missouri supreme court,[2] to enforce the provisions of sections 16 through 22, inclusive, of this article and, if the suit is sustained, shall receive from the applicable unit of government his costs, including reasonable attorneys' fees incurred in maintaining such suit.

[Emphasis added.]

■ The Hancock Amendment makes no pretense of protecting one level of government from another. By its clear language, Section 23 limits the class of persons who can bring suit to enforce the Hancock Amendment to "any taxpayer." In so doing Section 23 recognizes that any apparent injury to the school district is merely derivative of the taxpayers' injury. *Cf. Bartlett v. Ross,* 891 S.W.2d 114, 116 (Mo. banc 1995) (school dis-

tricts not considered real parties in interest in tax protests before State Tax Commission).

The school district plaintiffs do not, because they cannot, claim status as taxpayers. We hold, therefore, as did the trial court, that the school district plaintiffs in this case are without standing to bring an action to enforce Article X, Section 21.

The taxpayer plaintiffs do have standing, however; the remaining portions of this opinion discuss the taxpayers' claims exclusively.

### B.

■ Read as a whole, the Hancock Amendment, Mo. Const. art. X, §§ 16–24, aspires to erect a comprehensive, constitutionally-rooted shield erected to protect taxpayers from government's ability to increase the tax burden above that borne by the taxpayers on November 4, 1980. First, Section 18(a) establishes a revenue limit for state government the precise dimensions of which are not germane here. Second, Section 21 prohibits unfunded mandates. To the extent that the state required local governments to perform activities and provided some funding of those activities on November 4, 1980, the first sentence of Section 21 prohibits the state "from reducing the state financed proportion of the costs" of the mandated activity. The second sentence of Section 21 prohibits the state from requiring local government to begin a new mandated activity or to increase the level of a previously mandated activity beyond its 1980–81 level unless the General Assembly appropriates sufficient funds to finance the cost of the new or increased activity. Finally, local government may increase any "tax, license, or fees [sic]" only with voter approval. § 22(a).

As this case comes to this Court on summary judgment, only two issues concern us: First, whether Section 21 requires the state to maintain the 1980–81 proportion of state funding of mandated local government activities in subsequent years and, second, if the state must maintain the 1980–81 proportion,

2. *Buchanan v. Kirkpatrick,* 615 S.W.2d 6, 13, n. 8 (Mo. banc 1981), declared that this portion of Section 23 did not place original jurisdiction in this Court if such subject matter jurisdiction did not otherwise exist under Article V, Sections 3 and 4 of the Missouri Constitution.

whether the state is subject to a money judgment for years in which it failed to do so.

### 1.

The taxpayers claim that Section 21 requires the state to maintain the same proportion of funding for special education in each school district as it provided in fiscal year 1980–1981. They base their legal argument on the language of Section 21: "The state is hereby prohibited from reducing the state financed proportion...." The state defendants maintain that because the amount of state appropriations to fund special education at the local level has increased since fiscal year 1980–81, the state has not violated Section 21.

Commonly understood, the word "proportion" means "the relation of one part to another or to the whole with respect to magnitude, quantity, or degree: relative size: ratio." Webster's Third International Dictionary, 1819 (1976). Once "proportion" is understood as meaning a ratio, the state's insistence that its compliance with Section 21 can be measured by reference to the flat amount appropriated loses what little force it had.

■ Article III, Section 36, forbids the "withdrawal of money from the treasury, except in pursuance of appropriations made by law." Absent an appropriation by the General Assembly approved by the Governor, therefore, the constitution forbids any expenditure of state revenues. *State ex rel. Sikeston R–VI School District v. Ashcroft,* 828 S.W.2d 372, 375 (Mo. banc 1992). The constitution requires the General Assembly to "make appropriations for one or two fiscal years." Mo. Const. art. IV, § 23. Currently, the General Assembly appropriates for a single year at a time. *See, e.g.,* House Bills 1–19, Laws of Missouri 1993, 7–297. Thus, each year the appropriation to fund special education at local school districts begins at zero. Absent an affirmative act of the legislature to direct that funds be withdrawn from the treasury by a law that "distinctly specif[ies] the amount and purpose of the appropriation," Mo. Const. art. IV, § 23, no state funds are available for special education in local school districts.

■ By prohibiting the state from reducing the state financed proportion of the cost of mandated special education activities in the school districts, Section 21 requires the state to appropriate funds for financing special education in local school districts in amounts sufficient to keep the state's contribution to the cost of special education in the school districts at the same ratio as existed in fiscal year 1980–81. Failure to appropriate sufficient funds to maintain the 1980–81 proportion is an affirmative act by the state to reduce the state financed proportion of the cost of special education in each school district in violation of Section 21.

■ We hold, therefore, that Section 21 requires the state to maintain the same proportion of the cost of financing special education in local school districts in each year as existed in fiscal year 1980–1981. To the extent the trial court's judgment countenances a contrary result, it is reversed.

### 2.

#### a.

■ To support their factual averment that the state has violated Section 21, the taxpayers must present evidence to establish the program mandated by the state in 1980–81 and the ratio of state to local spending for the mandated program in that year. The taxpayers must then establish the costs of the mandated program in each subsequent year and the ratio of state to local spending for the mandated program in each subsequent year. Unless the school district's budgets allocated personnel costs and operating expenditures in a highly segmented manner, clearly distinguishing resources directly committed to the state mandates for special education from those not so dedicated, it may be impossible to prove the correct proportions.

Plaintiffs are mistaken that establishment of the Section 21 proportions requires no more than comparing 1980–81 and subsequent year costs with the state's contribution to special education in those years. In establishing the state's required contribution, the taxpayers may not include any discretionary expenditures a district undertook that went beyond the state mandate. For example, to

the extent that district finances permitted greater-than-required salary increases for special education instructors, aides, and other personnel, the taxpayers may not include these in the school district portion of the ratio. The taxpayers also must exclude any new or expanded activity required of the local district after 1980–81 for which the state bears full responsibility. *See, e.g., Rolla 31,* 837 S.W.2d at 5–7.

The state's liability is limited to the state's mandated activity and the state financed proportion of the cost of that activity in effect in 1980–81. Providing these factors for 1980–81 and each subsequent year will require sophisticated budgetary evidence and economic expertise.

b.

■ The taxpayers' summary judgment motion also seeks a declaration that Section 21 permits a money judgment against the state for the state's failure to maintain the 1980–81 proportion of special education funding in subsequent years.

Assuming that taxpayers could present sufficient evidence to establish the 1980–81 and subsequent year proportions, they are not entitled to a money judgment on behalf of the school districts against the state in any event. This is because, as the state defendants argue, sovereign immunity protects the state from a money judgment for a violation of Section 21.

■ In *Jones v. State Highway Commission,* 557 S.W.2d 225, 228 (Mo. banc 1977), this Court abolished sovereign tort immunity. With specific exceptions, the abolition of the common law doctrine of sovereign tort immunity was reversed by legislative action. §§ 537.600 and 537.610, RSMo 1994. Also in *Jones,* this Court acknowledged the existence of a more general theory of sovereign immunity from suit. *Id.* at 230. The more general rule is that the sovereign may not be sued without its consent. That rule was not abolished in *Jones.*

■ Here, Article X, Section 23, authorizes taxpayer suits to enforce the provisions of Section 21 without saying what remedies are available other than attorneys fees and costs. If Section 23 is a consent by the state to be sued for general money damages to enforce Section 21, the consent exists by way of inference or implication. This Court will not infer or imply that a waiver of sovereign immunity extends to remedies that are not essential to enforce the right in question.

Other equally effective but less onerous remedies *than permitting a money judgment against the state* are available to enforce a taxpayer's interests under Section 21. Specifically, a declaratory judgment relieving a local government of the duty to perform an inadequately funded required service or activity is an adequate remedy.

■ One purpose of the Hancock Amendment, of which Sections 21 and 23 are parts, is to limit expenditures by state and local government. *Boone County Court v. State,* 631 S.W.2d 321, 325 (Mo. banc 1982). A judgment requiring the state to spend more money would thwart that purpose. Because entry of a judgment for money damages is not essential to protect the rights granted taxpayers under Section 21 and is contrary to the Hancock Amendment's general purpose, we will not read Section 23 as a consent to a suit for a money judgment to enforce Section 21, except for the taxpayer's reasonable attorneys fees and costs.

**III.**

The judgment of the trial court is reversed and the cause remanded for further proceedings consistent with this opinion.

COVINGTON, C.J., and HOLSTEIN, BENTON, THOMAS, and LIMBAUGH, JJ., concur.

PRICE, J., dissents in separate opinion filed.

PRICE, Judge, dissenting.

I dissent from the majority opinion for three reasons. First, the opinion ignores the language of Section 21 of the Hancock Amendment. Second, the opinion ignores Missouri's Rules of Civil Procedure requiring fact pleading. Third, the consequences of the opinion will either be devastating to the State of Missouri in its sacrifice of necessary

services or antithetical to the Hancock Amendment by requiring a never-ending spiral of increased spending.

## I.

The fiction engaged in by the majority is obvious. A mere reading of its holding shows that it has ignored the actual language of Section 21 of the Hancock Amendment and substituted in its place language more to the suiting of the majority. The opinion states:

> We hold, therefore, that Section 21 requires the state to *maintain the same proportion* of the costs of financing special education in school districts as existed in fiscal year 1980–1981.

(Emphasis supplied.) The language of art. X, Section 21 of our constitution, however, reads:

> The state is hereby *prohibited from reducing* the state financed portion of the cost of any existing activity or services required of counties and other political subdivisions....

By replacing a prohibition against *reduction* of the state's proportion of spending with a requirement to *maintain* a proportion of funding, the majority materially changes the content of the Hancock Amendment.

The actual language of Section 21 does not impose any affirmative duty on the state. Instead, it merely prohibits the state from passing down to local governmental entities the cost of required activities by affirmatively reducing the portion of costs borne by the state. The majority opinion, however, now imposes upon the state an affirmative duty to match increases in local spending.

The difference could not be more dramatically shown than here. State spending for special education was $60,569,270 in 1981. By 1992–1993, state spending on special education had more than doubled to $140,946,607. Admittedly, local school districts allowed their expenses for special education to increase at an even faster pace, but there is no allegation in the pleadings or proof offered, whatsoever, that the school districts' increase in spending was required by or had anything to do with the state.

## II.

The majority also ignores the requirements of Rule 55.05. M.R.C.P. The rule provides that a petition "contain a short and plain statement of the facts showing that the pleader is entitled to relief". This requirement was extensively discussed in *ITT Commercial Finance v. Mid–America Marine Supply Corp.,* 854 S.W.2d 371 (Mo. banc 1993).

The operative allegations of plaintiffs' first amended petition are that:

23. In 1980–81, the year the Hancock Amendment became effective, the state financed 42.8% of the costs of special education in the Fort Zumwalt School District through categorical aid. In 1990–91, the state financed only 38.9% of the costs of special education in the Fort Zumwalt School District through categorical aid. In 1991–92, the state financed only 33.7% of said costs in that district through categorical aid. As a result, in 1990–91 and 1991–92, the Fort Zumwalt School District was forced to offset this deficiency in categorical aid for special education by the use of local tax monies and/or unrestricted state aid.

24. In 1980–81, the state financed 41.4% of the costs of special education in the Francis Howell School District through categorical aid. In 1989–90, the state financed only 40.8% of the costs of special education in the Francis Howell School District through categorical aid. In 1990–91, the state financed only 35.9% of said costs in that district through categorical aid. In 1991–92, the state financed only 32.4% of said costs in that district through categorical aid. As a result, in 1989–90, 1990–91 and 1991–92, the Francis Howell School District was forced to offset this deficiency in categorical aid for special education by the use of local tax monies and/or unrestricted state aid.

25. In 1980–81, the state financed 41% of the costs of special education in the St. Charles School District through categorical aid. In 1989–90, the state financed only 37.4% of the costs of special education in the St. Charles School District through

categorical aid. In 1990–91, the state financed only 36.2% of said costs in that district through categorical aid. In 1991–92, the state financed only 28% of said costs in that district through categorical aid. As a result, in 1989–90, 1990–91 and 1991–92, the St. Charles School District was forced to offset this deficiency in categorical aid for special education by the use of local tax monies and/or unrestricted state aid.

26. In 1980–81, the state financed 45.1% of the costs of special education in the Wentzville School District through categorical aid. In 1989–90, the state financed only 36.5% of the costs of special education in the Wentzville School District through categorical aid. In 1990–91, the state financed only 36.8% of said costs in that district through categorical aid. In 1991–92, the state financed only 24.6% of said costs in that district through categorical aid. As a result, in 1989–90, 1990–91 and 1991–92, the Wentzville School District was forced to offset this deficiency in categorical aid for special education by the use of local tax monies and/or unrestricted state aid.

27. The state violated Article X, Sections 16 and 21 of the Missouri Constitution in 1989–90, 1990–91 and 1991–92, by reducing the state financed proportion of the costs of special education services funded through categorical aid from the proportion provided to plaintiff school districts in 1980–81. Such reduction amounts to an unconstitutional shifting of the tax burden away from the state and onto local school districts and taxpayers.

As to these allegations, the majority correctly notes that:

> Plaintiffs are mistaken that establishment of the Section 21 proportions requires no more than comparing 1980–81 and subsequent year costs with the state's contribution to special education in those years.

Although generally discussing the need for "sophisticated budgetary evidence and economic expertise" that might separate out "mandated" expenditures from "discretionary" expenditures, and even giving an example of "greater-than-required salary increases", the majority never outlines what facts are required to state a cause of action. The school districts have made no allegations of what increases in expenditures were "mandated" by the state, what increases were beyond the state's or the school districts' control, or what increases were "discretionary" by the school districts. Neither have they made any attempt to plead that the change in the ratio of spending resulted from an affirmative act of the state to reduce its proportion of the expense of special education programs. As anyone can see by reading the pleadings here, plaintiffs have merely alleged a 1980–1981 state/school district expenditure ratio and corresponding ratios for the 1989–1990, 1990–1991, and 1991–1992 school years, numbers the majority apparently believes are inadequate to state a claim.

Nevertheless, the majority condones this failure in pleading that would have required dismissal against any other party. *ITT Commercial Finance*, 854 S.W.2d at 379. Aside from being inconsistent with our application of Rule 55.05 to all others, the problem now posed for plaintiffs, defendants, and the courts is clear. Despite the fact that plaintiffs have survived a motion for summary judgment, no one knows what facts or elements are essential for the school districts to prevail. Nor do they even know what facts the school districts will attempt to prove.

### III.

Finally, the majority opinion will result in either a horrendous loss of governmental services to the people of Missouri or a never-ending spiral of increased government spending. The majority opinion will require the state legislature to annually evaluate local spending in all programs where the state and a local governmental entity share funding responsibilities. If the state is unable to match local increases, the program can no longer be required. The consequence in many instances would be the forfeiture of massive amounts of federal matching funds upon which so many of our state services depend, such as schools, highways, and

health care. Surely, the majority cannot reasonably expect this to occur.

Instead, the reality of the majority's opinion will be that year after year the legislature will be forced to continually adjust its spending, ever upward, to match school district by school district and county by county spending, benefiting our richer counties at the expense of our poorer ones. In short, despite its rhetoric, the majority has transformed the Hancock Amendment from a shield to protect the people of Missouri from the increasing growth of government and taxation into a sword mandating continued increases in spending.

I cannot believe this was the intention of those who drafted the Hancock Amendment or the voters who passed it.