The SCHOOL DISTRICT OF KANSAS CITY, Missouri, et al., Appellants,

v.

STATE of Missouri, et al., Respondents,

and

Missouri Charter Public School Association, Respondent.

No. SC 90323.

Supreme Court of Missouri, En Banc.

Aug. 3, 2010.

Allan V. Hallquist, Michael E. Norton, Hayley E. Hanson and Derek Teeter, Husch Blackwell Sanders LLP, Kansas City, for Appellants.

State Solicitor James R. Layton, State Solicitor, Attorney General's Office, Jefferson City, for the State.

Charles W. Hatfield and Khristine A. Heisinger, Stinson Morrision Hecker LLP, Jefferson City, for Respondent.

LAURA DENVIR STITH, Judge.

The Kansas City Missouri School District ("KCMSD") and three individual taxpayers of the district appeal the trial court's rejection of their claims that the charter schools act, as amended in 2005: (1) violates Mo. Const. Art. X, § 11(g) by allegedly permitting some of the KCMSD's local tax levy to go to the local educational agency (LEA) charter schools in the district; and (2) violates Mo. Const. Art. X, §§ 16, 21—the "Hancock Amendment"—by allegedly placing a new, unfunded mandate on the KCMSD and because it led to a reduction in the absolute amount of state funding of the KCMSD's existing programs as the number of students attending KCMSD schools decreased.

The charter schools act does not require a direct or indirect transfer of funds from the KCMSD to any of the LEA charter

schools in the district. While the amount of state funds paid to the KCMSD per pupil pursuant to the foundation formula is reduced by an amount equivalent to the amount the state pays to these district charter schools per pupil based on the local levy, the money paid to these charter schools is state money, not locally levied funds. Second, even were the calculation used by the legislature considered to be an indirect transfer of locally levied funds to district charter schools, section 11(g) permits use of the monies locally levied under it for all "school purposes of the district." Missouri law is clear that the charter schools within the KCMSD are public schools of the district and, therefore, their use of the levy for school purposes for children of the district is not barred by section 11(g). For these and the other reasons set out herein, the charter schools act does not violate section 11(g).

This Court also finds the charter schools act does not authorize an unfunded mandate. While the General Assembly has authorized charter schools, that authorization did not require a new or increased activity on the part of the KCMSD. Further, the trial court did not err in concluding that the KCMSD improperly included discretionary spending and federally mandated spending in its cost basis and failed factually to meet its burden of showing that the state decreased its proportion of funding state-mandated programs beyond that permitted by the Hancock Amendment. Accordingly, the judgment of the trial court is affirmed.

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1998, the legislature enacted the charter schools act. *See* §§ 160.400–.420, RSMo Supp.2009.[1] As relevant here, these statutes authorize the creation of charter schools in metropolitan or urban school districts, which by statutory definition include the KCMSD. § 160.400.2. Beginning with the 1999–2000 school year, the first charter schools started operating within the KCMSD.

A charter school is an "independent *public* school." § 160.400.1 (emphasis added). Charter schools may be sponsored by "[t]he school board of the district" in which they are located or by certain public four-year colleges or universities, community colleges, or private four-year colleges or universities, § 160.400.2(1) to (4), or, under some circumstances, by the state board of education. § 160.405.2.

Just as with traditional public schools, a public charter school "shall enroll" all resident pupils who apply from "the district in which it operates" and "[n]onresident pupils eligible to attend a district's school under an urban voluntary transfer program...." § 160.410.1(1), (2) (to the extent space is available). "For the purposes of calculation and distribution of state school aid under section 163.031, RSMo, pupils enrolled in a charter school shall be included in the pupil enrollment of the school district within which each pupil resides." § 160.415.1. "A charter school may not charge tuition, nor may it impose fees that a school district is prohibited from imposing," § 160.415.10, nor may it accept any "grant, gift or donation ... if it is subject to any condition contrary to law applicable to the charter school or other public schools...." § 160.415.13.

This suit involves the lawfulness of the charter school funding mechanism adopted in 2005 for any charter school that has declared itself to be a LEA. Such LEAs:

shall receive from the department of elementary and secondary education an

1. All statutory references are to RSMo Supp. 2009 unless otherwise indicated.

annual amount equal to the product of the charter school's weighted average daily attendance and the state adequacy target, multiplied by the dollar value modifier for the district, plus local tax revenues per weighted average daily attendance from the incidental and teachers funds in excess of the performance levy as defined in section 163.011, RSMo, plus all other state aid attributable to such pupils.

§ 160.415.[2] The KCMSD's concern with the funding mechanism for LEAs arises from the fact that from the date of July 1, 2006, when each charter school operating within the boundaries of the KCMSD declared itself a LEA, the state has provided funds directly to the LEAs within the KCMSD based on the number of pupils attending such LEAs, according to the statutorily-required formula, which considers both charter school attendance and an amount of local tax revenue allocable to those pupils who attend public charter schools. The act does not require any such local tax revenue to be sent to charter schools, but it does provide for a reduction in state funding by an amount equivalent to that the state provides to the public charter schools in the district that are educating students of the district.[3]

Believing that the funding of LEA charter schools under the 2005 amendments is unconstitutional, the KCMSD and three individual taxpayers of the district filed suit against the state of Missouri, the department of elementary and secondary education, the state board of education and the commissioner of education in her official capacity. The Missouri Charter Public School Association intervened as a defendant. The suit alleges that sections 160.400 to .420 as amended in 2005[4] are unconstitutional on three grounds:

- Section 160.415 is alleged to permit some local property tax dollars to go to charter schools and thereby violates Mo. CONST. ART. X, § 11(g);

- The charter schools act created a new program of independent LEA charter schools that the state did not fund and that allegedly thereby constituted a new, unfunded state mandate in violation of Mo. CONST. ART. X, §§ 16, 21 (the "Hancock Amendment"); and

- As amended in 2005, the charter schools act has led to a reduction in

---

**2.** As previously enacted, section 160.415.2 had not provided for LEAs. Payments to charter schools, therefore, were to be made through the area school district (in this case the KCMSD), which acted as a disbursal agent. § 160.415.2, RSMo 2000. The payments included, in addition to other federal and state aid:

an annual amount equal to the product of the equalized, adjusted operating levy for school purposes for the pupils' district of residence for the current year times the guaranteed tax base per eligible pupil, as defined in section 163.011, RSMo, times the number of the district's resident pupils attending the charter school plus all other state aid attributable to such pupils, including summer school, if applicable, and all aid provided pursuant to section 163.031, RSMo.

§ 160.415.2, RSMo 2000. Where a charter school is not an LEA, the district remains a disbursal agent. *Id.*

**3.** Section 160.415.4 states:

If a charter school declares itself as a local education agency, the department of elementary and secondary education shall, upon notice of the declaration, reduce the payment made to the school district by the amount specified in this subsection and pay directly to the charter school the annual amount reduced from the school district's payment.

**4.** Although initially plaintiffs also had challenged the 2000 act, prior to the date the trial court entered judgment, plaintiffs restricted their challenge to the amended version of the charter schools act enacted in 2005 and now in effect.

the absolute amount of state funding of the KCMSD's existing programs as the number of students attending KCMSD schools has decreased; the KCMSD maintains this also violates the Hancock Amendment.

The trial court found the challenged sections of the amended charter schools act do not violate the above-mentioned Missouri constitutional provisions. The KCMSD and the three individual taxpayers appeal. Because the validity of a statute is at issue, appeal is directly to this Court. Mo. CONST. ART. V, § 3.

## II. STANDARD OF REVIEW

As the decision below involves the constitutional validity and construction of state statutes, this Court's review is *de novo*. *Bd. of Educ. of City of St. Louis v. Mo. State Bd. of Educ.*, 271 S.W.3d 1, 7 (Mo. banc 2008); *Gash v. Lafayette County*, 245 S.W.3d 229, 231 (Mo. banc 2008). "A statute is presumed to be constitutional and will not be invalidated unless it 'clearly and undoubtedly' violates some constitutional provision and 'palpably affronts fundamental law embodied in the constitution.'" *Bd. of Educ. of City of St. Louis v. State*, 47 S.W.3d 366, 368–69 (Mo. banc 2001) (internal citations omitted). "Doubts will be resolved in favor of the constitutionality of the statute." *Mo. Prosecuting Attorneys and Circuit Attorneys Ret. Sys. v. Pemiscot County*, 256 S.W.3d 98, 102 (Mo. banc 2008). "The person challenging the validity of the statute has the burden of proving the act clearly and undoubtedly violates the constitutional limitations." *Franklin County ex rel. Parks v. Franklin County Comm'n*, 269 S.W.3d 26, 29 (Mo. banc 2008), *citing*, *Trout v. State*, 231 S.W.3d 140, 144 (Mo. banc 2007).

To the extent the claims involve evidentiary issues, the trial court's determination of those issues will be affirmed "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976), *accord*, *Watson v. Mense*, 298 S.W.3d 521, 525 (Mo. banc 2009). "The trial court is free to believe or disbelieve all, part or none of the testimony of any witness." *Watson*, 298 S.W.3d at 525–26, *citing*, *T.B.G. v. C.A.G.*, 772 S.W.2d 653, 654 (Mo. banc 1989). "When determining the sufficiency of the evidence, an appellate court will accept as true the evidence and inferences from the evidence that are favorable to the trial court's decree and disregard all contrary evidence." *Watson*, 298 S.W.3d at 526.

## III. SECTION 160.415 DOES NOT VIOLATE ARTICLE X, SECTION 11(g)

The KCMSD first argues that the 2005 amendments to the Charter Schools Act violate article X, section 11(g) of the Missouri Constitution. Adopted by the voters in April 1998, section 11(g) states:

The school board of any school district whose operating levy for school purposes for the 1995 tax year was established pursuant to a federal court order may establish *the operating levy for school purposes for the district* at a rate that is lower than the court-ordered rate for the 1995 tax year. The rate so established may be changed from year to year by the school board of the district. Approval by a majority of the voters of the district voting thereon shall be required for any operating levy for school purposes equal to or greater than the rate established by court order for the 1995 tax year. *The authority granted in this section shall apply to any successor school district or successor school districts of such school district.*

Mo. Const. Art. X, § 11(g) (emphasis added).

The KCMSD is the only school district "whose operating levy for school purposes for the 1995 tax year was established pursuant to a federal court order...." *Id.* Section 11(g) applies to it and determines the upper dollar limit that the KCMSD may authorize as an operating levy without approval of the voters of the district.[5] The KCMSD notes that it is the only school district subject to section 11(g) and that its board is directed to set the operating levy. This must mean, it argues, that section 11(g) was enacted specifically and solely for the benefit of the KCMSD itself (which had been found to be providing an inadequate education to students of the district), rather than for the benefit of the students of the district whether attending KCMSD schools or other public schools of the district. Therefore, the KCMSD argues, the Missouri General Assembly is prohibited by section 11(g) from enacting laws that would pay any local revenue collected under the authority of section 11(g) to any entity other than the KCMSD. To the extent that the charter schools act, *directly or indirectly,* permits funds levied under section 11(g) to be paid to one or more charter schools, the KCMSD argues, it is invalid under section 11(g).

■ In considering this argument, the Court starts from the premise that "[t]he fundamental purpose of constitutional construction is to give effect to the intent of the voters who adopted the Amendment." *Keller v. Marion County Ambulance Dist.,* 820 S.W.2d 301, 302 (Mo. banc 1991), *citing, Boone County Court v. State,* 631 S.W.2d 321, 324 (Mo. banc 1982). "In arriving at the intent and purpose the construction should be broad and liberal rather than technical, and the constitutional provision should receive a broader and more liberal construction than statutes." *State Hwy. Comm'n v. Spainhower,* 504 S.W.2d 121, 125 (Mo.1973), *citing, Rathjen v. Reorganized Sch. Dist. R–II,* 365 Mo. 518, 284 S.W.2d 516, 524 (1955).

*A. No Direct Transfer of Funds Occurs*

■ The KCMSD does not place much emphasis on the argument that the charter schools act requires a direct transfer of funds from it to any charter school; in fact, by its terms, the act does not provide for any such direct transfer of funds to LEAs. Further, the KCMSD admits that, as a factual matter, it does not transfer funds it collects pursuant to the local levy authorized by section 11(g) to any LEA charter school. The argument that there is a direct transfer of funds in alleged violation of section 11(g) is without merit.

*B. No Improper Indirect Transfer of Funds Occurs*

The KCMSD alternatively argues that the charter schools act authorizes an indirect transfer of funds from it to charter schools within the district in violation of section 11(g). This argument is similarly without merit for multiple reasons.

First, the fact that the KCMSD's state funding is reduced by an amount equivalent to the funding provided by the state to charter schools within the district that have declared themselves to be LEAs does not constitute an indirect or "effective" transfer of funds from the KCMSD to such charter schools. No money actually is transferred from the KCMSD to any charter school; it keeps the money raised by the local levy.

5. As the levy set by the federal court was $4.96 per $100, this means that a levy of $4.95 per $100 or less does not need voter approval. The KCMSD has set the levy at $4.95 per $100.

While the amounts locally levied are considered by the state in determining the amount of state funds provided to either the KCMSD or to charter schools in the district, no local money is used for this purpose. The portion of state funds allocated to the KCMSD is not required constitutionally to be segregated or specially set aside for it. State monies are fungible; they cannot be traced to any particular source of funds, nor may they be carved out for use for any particular purpose unless authorized by law. "This is upon the theory that money acquired by the state or county by taxation is not the private property of any county or school district, but is the property of the state, which may be used for any public purpose the Legislature may deem wise." *State ex rel. Clark v. Gordon*, 261 Mo. 631, 170 S.W. 892, 895 (1914). Nothing in section 11(g) addresses how the state is to determine the amount of state funds to send to the KCMSD or to other public schools in the district, including charter schools. Nothing in section 11(g) prohibits the state from considering other revenue sources of the KCMSD, or whether students in the district are being educated by public charter schools rather than by the KCMSD in deciding the amount of state revenue to send to the KCMSD, as opposed to the charter public schools of the district that also are educating district students. As this Court noted in *Franklin County*, except for the limitations imposed by the Missouri or federal constitutions, "the power of the State Legislature is unlimited and practically absolute." 269 S.W.3d at 31.

Second, even were the calculation used by the legislature considered to be such an indirect transfer, section 11(g) nowhere states that all monies collected under the levy must be paid to the KCMSD and that no levied funds may be paid to other public schools of the district, as the KCMSD suggests. While the legislature did use the amount of the levy raised by "local effort" as an element in the formula for calculating payments to the local charter schools, nothing in section 11(g) prohibits it from doing so for pupils who choose to attend a charter public school of the district rather than to attend a public school operated by the KCMSD. Indeed, to pay state revenue to the KCMSD for a student whom it is not educating rather than to the charter school that is undertaking that pupil's education would seem to reduce the funding available to educate students in schools in the district, thereby undercutting the very purpose of section 11(g).[6]

---

**6.** This Court repeatedly and consistently has held that the method—the form—an action takes can be essential in determining whether a certain outcome is allowed. *See, e.g., Franklin County*, 269 S.W.3d at 29–31 (while the Hancock Amendment prohibited a tax levy increase without the approval of voters, it did not require voter approval where an increase in revenue came from other causes, even though the result in both cases was to give the municipality extra funds); *C & D Inv. Co. v. Bestor*, 624 S.W.2d 835, 837–38 (Mo. banc 1981) (action brought under a statutory section authorizing payment of property taxes under protest based on allegations of discrimination was deemed untimely as it was not a substitute for proper administrative provisions relating to property assessment. "Where, as is the case here, there is no ques-

tion of overreaching by the taxing authorities, section 139.031 is not a substitute for the administrative provisions relating to the assessment of property for tax purposes. That section may not be used by the taxpayer to avoid the time limitations of [sections] 137.290, 138.090, 138.100, and 138.110"); *Beelman Truck Co. v. Ste. Genevieve County Bd. of Equalization*, 861 S.W.2d 557, 559 (Mo. banc 1993) (The Interstate Commerce Clause was not violated because an assessor used a proper method of apportioning the value of a fleet of tractor trucks and trailers. Simply put, the assessor's methods followed statutory requirements; therefore, the assessment was appropriate). Similarly, were it improper to order the KCMSD to make a direct payment equivalent to levied funds per

Further, had section 11(g) been intended to limit funding to the schools run by the KCMSD school board, it easily could have mentioned the KCMSD specifically by name or description, as section 11(g) does elsewhere when it refers to the "school board of any school district whose operating levy for school purposes for the 1995 tax year was established pursuant to a federal court order." Mo. CONST. ART. X, § 11(g). Rather than specifying that all funds are to go to the KCMSD, however, section 11(g) instead broadly authorizes use of the funds raised by the levy "for school purposes of the district."

█ While the Constitution does not define the term "school purposes for the district," "[t]he words 'school purposes' are general words and the meaning of the term must be construed broadly and in accordance with their plain and ordinary meaning, unless some good reason, consistent with the purpose of the constitutional provision, otherwise appears." *Rathjen*, 284 S.W.2d at 524. Nothing in the language of section 11(g) manifests an intent to depart from the plain and ordinary meaning of the words used in it: Funds collected by the levy may be used for school purposes by schools of the district.

The final sentence of section 11(g) confirms that the provision plainly is intended to survive changes in the structure, geography and/or composition of the KCMSD, stating that the levy authority "granted in this section shall apply to any successor school district or successor school districts of such school district." Mo. CONST. ART. X, § 11(g).

█ The broadly worded phrase used in section 11(g) must be interpreted liberally

to accomplish the purposes of the voters. *Spainhower*, 504 S.W.2d at 125.

A principle of construction that should be kept in mind is that while the construction of constitutional provisions should be neither liberal nor strict, it is quite generally held that in arriving at the intent and purpose the construction should be broad and liberal rather than technical, and the constitutional provision should receive a broader and more liberal construction than statutes.... The reason is, a constitution is expected to be effective over a longer period of time, and its method of revision or amendment is more cumbersome than the legislative process.

*Rathjen*, 284 S.W.2d at 524. "This Court is not free to add limitations on the legislature's authority regarding taxation and revenue that are not enumerated in the Missouri Constitution or the United States Constitution ... and it will not do so here." *Franklin County*, 269 S.W.3d at 31.

Section 11(g) says the levied funds are to be used for school purposes of the district. The plain language of the charter schools act states that charter schools are public schools. § 160.410.1(1). It says that a charter school "shall enroll" all resident pupils "in the district in which it operates" as well as "[n]onresident pupils eligible to attend a district's school under an urban voluntary transfer program." § 160.410.1(1), (2). Further, "[f]or the purposes of calculation and distribution of state school aid under section 163.031, RSMo, pupils enrolled in a charter school shall be included in the pupil enrollment of

---

pupil from itself to the public charter schools of the district, that would not prohibit indirect consideration of such funds in determining other state aid to the KCMSD, so long as the

method used was not itself prohibited. Such an indirect transfer, should it exist, is not so barred.

the school district within which each pupil resides." § 160.415.1.[7]

As is evident, while the KCMSD operates many public schools in the district, it does not operate the only public schools in the district. Charter schools that are LEAs are also public schools of the district. They are not barred by section 11(g) from using levied funds, although in fact they do not do so but instead are sent state revenue equivalent to what they otherwise would be entitled to receive per pupil from locally levied funds. The KCMSD's arguments that charter schools are not engaging in "school purposes of the district" when educating pupils of the district are without merit.

■■■ The KCMSD says this construction of section 11(g) must be incorrect because there were no charter schools when section 11(g) was adopted, and, therefore, section 11(g) could not have been intended to include charter schools. But this ignores the fact that the language the voters adopted in section 11(g) shows they did broadly authorize use of the levy for all forms of school purposes of the district and did not limit use of the funds to the KCMSD school board's use. The KCMSD's argument also ignores the fact that the charter schools act was introduced and passed during the 1998 legislative session and was signed by the governor on June 23 of that year, becoming effective August 28, 1998, while article X, section 11(g) was proposed in 1997 by a House Joint Resolution and adopted by the people at an election held on April 7, 1998. Therefore, the people would have been aware of the contemporaneous nature of the charter schools act and section 11(g). As this Court noted in *Rathjen*:

A contemporaneous legislative construction is entitled to and will be given serious consideration by the court in determining the meaning of an ambiguous constitutional provision, both as a matter of policy and also because it may be presumed to represent the true intent of the instrument. *State ex rel. City of Carthage v. Hackmann*, 287 Mo. 184, 229 S.W. 1078, 1081 [ (1921) ]; *State ex rel. O'Connor v. Riedel*, 329 Mo. 616, 46 S.W.2d 131 [ (1932) ]; *State ex inf. Hadley ex rel. Wayland v. Herring*, 208 Mo. 708, 106 S.W. 984 [ (1907) ]. The General Assembly, in framing the 1950 amendment and the act to implement it, as well as the 1945 constitutional provision, must be presumed to have known the problems presented which indicated the desirability of an amendment, and to have drawn the amendment in a way to prevent or remedy the difficulty. *Koontz v. City of St. Louis, Mo.*, 84 S.W.2d 131 [ (Mo.1935) ]; *Lovins v. City of St. Louis*, 336 Mo. 1194, 84 S.W.2d 127 [ (1935) ]; *State ex rel. City of Boonville v. Hackmann*, 293 Mo. 313, 240 S.W. 135 [ (1922) ]; *State ex rel. City of Carthage v. Hackmann*, 287 Mo. 184, 229 S.W. 1078, 1080 [ (1921) ]; 16 *C.J.S., Constitutional Law*, § 16, pp. 52, 53.

The General Assembly, unless restrained by the constitution, is vested, in its representative capacity, with all the primary power of the people. *Ludlow–Saylor Wire Co. v. Wollbrinck*, 275 Mo. 339, 205 S.W. 196, 197 [ (1918) ]. In view of this fact, great deference should be had for the fact that the legislature made no distinction between 'school purposes' and 'district purposes' at any time when dealing with this section. In considering contemporaneous legislative

---

7. In addition, the charter school act specifies that charter schools are not to "be held to lower performance standards than *other* pub-

lic schools within a district...." § 160.405.5(6)(c) (emphasis added).

construction, this court, in the case of *State ex rel. O'Connor v. Riedel, supra, held,* 46 S.W.2d loc. cit. 134: 'Though not conclusive, such interpretation is entitled to great weight and should not be departed from unless manifestly erroneous.'

*Rathjen,* 284 S.W.2d at 526.

Similarly, there is no merit to the KCMSD's argument based on federal court approval of the state's settlement of the KCMSD desegregation suit. In 1996, the KCMSD and the state reached an approved settlement of a desegregation suit against them. In *Jenkins v. Missouri,* 122 F.3d 588, 603 (8th Cir.1997), the Eight Circuit describes the joint resolution that submitted what is now section 11(g) to the voters for approval as "a constitutional amendment [meant] to allow the KCMSD to maintain the levy at its present level with district voter approval, thereby providing a means for continued financial support of the KCMSD independent of court order after the KCMSD is no longer under court supervision." *Id.* This language merely states a fact not in dispute: The KCMSD receives funding via the levy. It does not state that under the amendment—not yet enacted at the time *Jenkins* was decided—only the KCMSD and not other public schools of the district educating students of the district in the district could receive the funding. Neither did it state that such funding could not be considered by the state in determining what additional state funding to provide the district where, as here, numerous students of the district now go to other public schools—charter schools—of the district. Indeed, the KCMSD was itself a defendant, not a plaintiff, in the underlying desegregation litigation, which was brought for the benefit of the students of the district, not for the benefit of the KCMSD per se. As noted above, section 11(g) contemplates that one or more districts may take the place of the KCMSD. Nothing in section 11(g) or *Jenkins* suggests the contrary.

■ Finally, the Court notes that the KCMSD's current argument that the transfer of funds is not authorized by section 11(g) is inconsistent with the fact the KCMSD itself transferred funds to charter schools of the district without protest from 1999 until 2006 and actually served as the sponsor of two district charter schools during much of that period, indicating its administrative interpretation of section 11(g) that charter schools serving district students are "schools of the district." "The administrative interpretation given a constitutional or statutory provision by public officers charged with its execution, while not controlling, is entitled to consideration, especially in case of doubt or ambiguity." *State ex rel. Curators of Univ. of Mo. v. Neill,* 397 S.W.2d 666, 670 (Mo. banc 1966) (internal citations omitted); *Rathjen,* 284 S.W.2d at 526 ("[T]he well-established rule of construction that an interpretation of a statute by public officers charged with its execution, while not controlling upon the courts, is entitled to consideration").

In sum, under the charter schools act, the KCMSD keeps all local revenue, including that generated under section 11(g). Section 11(g) permits the money raised by the operating levy to be used for school purposes of the district, not just by the KCMSD school board for the schools it operates. School purposes of the district include charter schools because the charter schools are public schools of the district and also operate for school purposes in the district. *Rathjen,* 284 S.W.2d at 524 ("The unfettered term 'school purposes,' connotes an all-inclusive meaning . . ."). The KCMSD has cited no law or constitutional provision prohibiting the legislature from considering that the KCMSD now

has fewer pupils on which it must spend the local levy (which has stayed at the same amount since the settlement) in deciding that the KCMSD needs fewer state funds. The fact that the state has adopted a formula for payments to the KCMSD that results in it reducing the payments to the KCMSD by the amount paid to charter schools of the district so as to take into account which schools are educating district students is not prohibited by section 11(g), and, therefore, is not determinative of this appeal.

The KCMSD's claim that section 160.415 violates article X, section 11(g) fails.

## IV. THE TAXPAYERS' HANCOCK CLAIMS

### A. The Hancock Amendment and Standing

Commonly referred to as the "Hancock Amendment," article X, sections 16 to 24 of the Missouri Constitution "aspire[ ] to erect a comprehensive, constitutionally-rooted shield erected to protect taxpayers from government's ability to increase the tax burden above that borne by the taxpayers on November 4, 1980." *Fort Zumwalt Sch. Dist. v. State,* 896 S.W.2d 918, 921 (Mo. banc 1995). In relevant part, article X, section 16 of the Missouri Constitution states, "The state is prohibited from requiring any new or expanded activities by counties and other political subdivisions without full state financing, or from shifting the tax burden to counties and other political subdivisions." Article X, section 21 prohibits the state from requiring unfunded new or increased activities or services:

> The state is hereby prohibited from reducing the state financed proportion of the costs of any existing activity or service required of counties and other political subdivisions. A new activity or service or an increase in the level of any

activity or service beyond that required by existing law shall not be required by the general assembly or any state agency of counties or other political subdivisions, unless a state appropriation is made and disbursed to pay the county or other political subdivision for any increased costs.

Mo. CONST. ART. X, § 21.

As stated in *Fort Zumwalt,* 896 S.W.2d at 921, "By its clear language, Section 23 [of the Hancock Amendment] limits the class of persons who can bring suit to enforce the Hancock Amendment to 'any taxpayer.'" It states in relevant part:

> Notwithstanding other provisions of this constitution or other law, any *taxpayer* of the state, county, or other political subdivision shall have standing to bring suit in a circuit court of proper venue . . . to enforce the provisions of sections 16 through 22. . . .

Mo. CONST. ART. X, § 23 (emphasis added). Further, "[t]he school district plaintiffs do not, because they cannot, claim status as taxpayers." *Fort Zumwalt,* 896 S.W.2d at 921.

As the trial court noted, the KCMSD is without standing to bring actions to enforce article X, sections 16 and 21 because a school district may not claim status as a taxpayer. *Id.* The individual taxpayer plaintiffs, however, do have standing to bring both Hancock claims.

### B. Section 160.415 Does Not Violate the Hancock Amendment

The taxpayers argue section 160.415 of the 2005 act creates an unfunded mandate in violation of article X, sections 16 and 21 in requiring the KCMSD to transfer a portion of its local tax revenue to charter schools. Because, for the reasons noted above, the amendment does not transfer a portion of local tax revenue

to charter schools, this argument is without merit.

Even were this not the case, the charter schools act does not authorize an unfunded mandate. The Hancock Amendment's bar on unfunded mandates can be violated in two ways: either if the state requires a new or increased activity or service of a political subdivision or if the political subdivision experiences increased costs in performing an existing activity or service without receiving additional funding from the state. *See Neske v. City of St. Louis*, 218 S.W.3d 417, 422 (Mo. banc 2007); *Miller v. Dir. of Revenue*, 719 S.W.2d 787, 788–89 (Mo. banc 1986). The burden is on the plaintiffs to prove that an unfunded mandate exists by offering "specific proof of new or increased duties and increased expenses, and these elements cannot be established by mere 'common sense,' or 'speculation and conjecture.'" *Brooks v. State*, 128 S.W.3d 844, 849 (Mo. banc 2004), *quoting, Miller*, 719 S.W.2d at 789.

In *Neske*, the standard for proof of an unfunded mandate was not met because, while it was more expensive for the city to fund its police retirement system and firemen's retirement system than it had been in a previous fiscal year, the same formula was used. This did not amount to a new or increased activity funding mandate. 218 S.W.3d at 422. As this Court stated, "The question is whether the City has been mandated to bear new responsibilities in relation to this activity. It has not." *Id.* "The City's requirements to pay are unchanged—the City still is required to pay the entire amounts certified by the PRS and the FRS boards of trustees. There is no new or increased activity." *Id.*

On the other hand, this Court found there was an unfunded mandate in *Rolla 31 Sch. Dist. v. State of Missouri*, 837 S.W.2d 1 (Mo. banc 1992). In that case, the department of elementary and secondary education "sent a letter to all Missouri school districts advising them that school districts were obligated to provide special education and related services for disabled three- and four-year-old children beginning with the 1991–92 school year." *Id.* at 6. This meant that school districts were required to provide educational services to a *new population* of district residents, yet they were not provided with the funds to do so, and this constituted an unfunded mandate under Hancock. *Id.* at 6–7.

This case is more like *Neske* than *Rolla*. First, it is clear that while the General Assembly now has authorized charter schools, that authorization did not require a new or increased activity on the part of the KCMSD. It did not require establishment of charter schools at all; it merely authorized them. Before the act, the KCMSD (and other public school districts) were required to provide a free public education to all eligible pupils who attended. This requirement remains. The KCMSD serves no role in funding the charter schools, and their existence does not create or increase any mandate to the district.

Second, plaintiffs are correct that the Hancock Amendment prohibits the state from "reducing the state financed proportion of the costs of any existing activity or service required of counties and other political subdivisions." Mo. CONST. ART. X, § 21. But the KCMSD did not show that the state decreased its proportion of funding of state-mandated programs beyond that permitted by the Hancock Amendment without a vote of the people.

As this Court noted in *Fort Zumwalt*, to establish a violation of section 21, plaintiffs "must present evidence to establish the program mandated by the state in 1980–81 and the ratio of state to local

spending for the mandated program in that year" and further prove "costs of the mandated program in each subsequent year and the ratio of state to local spending for the mandated program in each subsequent year." 896 S.W.2d at 922.

■ It is well-settled that the calculation of a mandated program's costs *"may not include any discretionary expenditures* a district undertook that went beyond the state mandate" and requires that plaintiffs clearly distinguish "resources directly committed to the state mandates ... from those not so dedicated." *Id.* (emphasis added). "Providing these factors for 1980–81 and each subsequent year ... require[s] sophisticated budgetary evidence and economic expertise." *Id.* at 923.

■ The trial court below was presented with conflicting evidence as to whether increased costs were placed on the KCMSD to perform state-mandated existing activities or services as a result of the charter schools act. "The trial court is free to believe or disbelieve all, part or none of the testimony of any witness." *Watson,* 298 S.W.3d at 525–26, *citing, T.B.G.,* 772 S.W.2d at 654.

■ Here, the trial court found that it could not rely on plaintiffs' expert's testimony to the extent her opinions overstated the amount of state-mandated activity and treated variable or semi-variable costs as fixed costs; as a result, plaintiffs did not meet their burden under *Fort Zumwalt.* This Court will affirm this determination "unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law." *Murphy,* 536 S.W.2d at 32.

At trial, plaintiffs presented an expert witness who testified as to two possible formulas for determining the applicable ratio of state-to-local spending. Her testimony, if believed, tended to show that the percentage of funding for state-mandated programs decreased since the 1980–1981 school year. The defendants' evidence, found to be more credible by the trial court, showed that the district's expert failed to identify the amount of local revenues actually expended on state-mandated activities and expenses as opposed to discretionary ones or expenses imposed by federal requirements such as the No Child Left Behind Act.

For example, the expert considered expenses the KCMSD chose to pay for teacher salaries in excess of the state-mandated minimum teacher salary, yet the KCMSD expert admitted her figures assumed all teacher salary expenses were mandated by the state and further did not reduce the number of teachers in proportion to the reduction in pupils served by the KCMSD. This was improper, as this Court clearly noted in *Fort Zumwalt:* "For example, to the extent that district finances permitted greater-than-required salary increases for special education instructors, aides, and other personnel, the taxpayers may not include these in the school district portion of the ratio." 896 S.W.2d at 922–23.

Similarly, state law does not mandate any particular level of spending for benefits for teachers and other employees, nor does state law require spending for FICA and Medicare payments; yet the expert included district-chosen benefits and federally mandated spending in her calculation of state-mandated costs. The KCMSD expert also included all building costs without any deduction for the fact that the KCMSD school board's own study found that in 2006 the District had excess building capacity and an average utilization rate for its buildings of around 70 percent. She did not address whether such a substantial underutilization is reasonable, and the trial

court could have accepted the view of opposing experts that it was improper not to consider the excess cost of such building expenditures to not be state-mandated. The trial court also heard from the charter schools' expert, who testified discretionary expenditures classified as state-mandated by the KCMSD included inefficient transportation costs.

This is not to suggest that the KCMSD's additional expenditures were not of benefit to the students of the district; many such discretionary expenditures, as well as those federally required, are undoubtedly important for the proper education of students in the KCMSD. But if expenditures are not mandated by the state, they are not relevant for Hancock purposes. It was within the trial court's discretion, based on the evidence presented, to determine that state-mandated expenditures, without consideration of discretionary or federally mandated expenditures, did not violate Hancock because the proportion of mandated expenses paid by the state has not decreased

## V. CONCLUSION

For all of the reasons stated above, the circuit court's judgment is affirmed.

All concur.